**TRAVELODGE HOTELS, INC., Plaintiff,**

v.

**HONEYSUCKLE ENTERPRISES, INC.; and Ryan Richardson, Defendants.**

**No. CIV.A. 02–2889JAG.**

United States District Court, D. New Jersey.

Feb. 16, 2005.

David Sager, Pitney, Hardin, Kipp & Szuch LLP, Morristown, NJ, for Plaintiff.

John T. Doyle, Esq., The Goldstein Law Group, P.C., Annandale, Jeffrey M. Goldstein, Esq., The Goldstein Law Group, P.C., Washington, D.C., for Defendants.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motions of Plaintiff Travelodge Hotels Inc. ("Travelodge" or "Plaintiff") for summary judgment, pursuant to FED. R. CIV. P. 56, on Counts 2, 4, and 6 of the complaint against Defendants Honeysuckle Enterprises, Inc. ("Honeysuckle") and

Ryan Richardson ("Richardson"), and for summary judgment on Defendants' counterclaims.

For the reasons set forth below, Plaintiff's motion for summary judgment on Counts 2, 4, and 6 of the complaint is denied. Plaintiff's motion for summary judgment on Defendants' counterclaims is denied as to Counts 1, 2, 3, 4, and 6 and granted with respect to Counts 5 and 7.

## BACKGROUND

This case arises from a dispute between Travelodge, a franchisor, and one of its former franchisees, Honeysuckle, and Honeysuckle's principal and guarantor, Richardson.[1]

### A. Negotiations

In this action, Travelodge is seeking payments from Defendants under a franchising agreement, and Defendants are seeking to avoid liability under the agreement on the basis that Travelodge induced Richardson into entering the agreement by fraud and misrepresentation. As discussed more fully below, Travelodge asserts that these facts are parol evidence and should not be considered by this Court. For Defendants, the negotiations are the heart of this controversy.

Richardson has testified that the following exchanges occurred prior to the parties' execution of the License Agreement:

What I recall is Jim coming into my office and representing himself to me as a salesman for the Travelodge franchise. He told me he could bring me at least 15 percent reservations by hooking me up to a central reservation system. He told me about the Internet program they were developing, it would go nationwide.

---

1. This Court has diversity jurisdiction over this action, pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties and the amount in controversy exceeds $75,000. Travelodge is a Delaware corporation with its principal place of business in New Jersey. Both Honeysuckle and Richardson are citizens of Missouri.

All you do is click and my property would be on that if I chose to franchise. He spoke of the benefits of having a Travelodge sign ... on our marquee out by the road and thought that would be a benefit to us. He specifically said that he could generate at least 15 percent of my reservations and they even looked at my numbers.

(Deposition Transcript of Ryan Richardson dated May 15, 2003 ("Richardson Dep. Tr."), at 54:1–17.) In explaining why he entered into a franchise agreement, Richardson further testified:

I was told by Jim Evans and David Larsen that I would receive at least 15 percent reservations. I would be on the Internet which should generate even more reservations. They produced to me a monthly lost business report that showed that 12,000 rooms [had been] denied in Branson—specifically in the Branson market and if I were to franchise, I would get all of that lost business. And then they also talked again about putting a sign up on my marquee which was supposed to generate walk-in. The reason, the decision was made because of the at least 15 percent reservations because they had access to all my numbers. It was a huge number. And the lost business report ... you got 12,000 rooms that was turned away, so it was a big number ... A 15 percent res[ervation] contribution is the words both Jim and David Larsen used. Reservations from the reservation system of Travelodge that would generate room revenue or room occupancy equal to 15 percent of the entire occupancy that Honeysuckle Inn Conference Center would have.

(Richardson Dep. Tr. at 74:16–75:12; 75:15–20.)

Travelodge and Honeysuckle entered into three separate agreements on or about January 9, 2001:(1) a License Agreement, which set forth the terms of their franchising agreement; (2) a Software and Services Contract (herein "S & S Contract"); and (3) an Integrated System Agreement ("IS Agreement"). (Exhibit A to the Affidavit of James D. Darby dated December 18, 2003 ("Darby Aff.") (License Agreement); Exhibit B to Darby Aff. (S & S Contract); Exhibit C to Darby Aff. (IS Agreement)).

Richardson and Travelodge also executed a Guaranty, which provided that Richardson would "immediately make each payment and perform or cause Licensee [Honeysuckle] to perform, each unpaid or unperformed obligation of the Licensee under the [License] Agreement." (Exhibit D to Darby Aff.)

## B. Terms of the License Agreement [2]

The License Agreement provided that Honeysuckle would operate a Travelodge for 15 years in Branson, Missouri. (Complaint dated June 17, 2002 ("Compl."), at ¶ 9; Exhibit A to Compl.) In exchange for converting the Honeysuckle Inn to a Travelodge hotel, Honeysuckle, among other things, would receive the benefit of participating in Travelodge's central reservations system. Section 4.2 specifically provided that the Honeysuckle Inn ("Facility") would participate in the reservations system, beginning on the opening date, through the term of the contract. Under Section 11.4 of the License Agreement, Travelodge had the power to suspend Honeysuckle's access to the reservations system upon failure to pay or perform under the License Agreement.

Honeysuckle had various obligations to Travelodge. Sections 7 and 18.5, and

---

**2.** The License Agreement is attached as Exhibit A to the Complaint and to the Darby

Affidavit.

Schedule C required Honeysuckle to make periodic payments for royalties, service assessments, taxes, interest, reservation system user fees, and other fees, which were coined "Recurring Fees." (Compl. ¶ 10; Exhibit A to Compl.) Section 3.8 obligated Honeysuckle to prepare and submit monthly reports concerning gross room revenue to Travelodge, and also maintain records, books, and accounts.

If Honeysuckle failed to fulfill its obligations, the License Agreement provided various remedies to Travelodge under Sections 11, 12, and 13. Section 11 governed default and termination. Section 11.1 defined default as occurring upon Honeysuckle's failure to pay, failure to perform, or breach of the License Agreement. It further provided that, where Travelodge notified Honeysuckle of its failure to file a monthly report, pay an amount due, or to maintain confidentiality obligations, and Honeysuckle failed to cure the default within 10 days, Travelodge was authorized to terminate the License Agreement. Pursuant to this section, the failure to cure any other default upon notice from Travelodge within 30 days was grounds for termination of the License Agreement.

Section 11.2 permitted Travelodge to terminate the License Agreement if, upon notice to Honeysuckle, Honeysuckle, among other things: (1) fails to cure a default pursuant to § 11.1; (2) discontinues operating the Facility as appropriate; (3) suffers the termination of another license agreement or franchise agreement with Travelodge or an affiliate; (4) generally fails to pay debts as they become due in the ordinary course of business; or (5) receives two or more notices of default in any one year period (regardless of whether the default is cured).

Section 12 reflects Travelodge's standard liquidated damages clause, and should be read in conjunction with § 18.3, which modifies Section 12 by setting liquidated damages at $50,000 if termination occurs before the end of the first year. The amounts increase depending on the date of termination, but if termination occurs after the third year of the License Agreement, liquidated damages are capped at $150,000.

Section 13 governs post-termination obligations. Under § 13.2, Travelodge is authorized to remove the Facility from the Reservation System immediately and divert reservations elsewhere. Travelodge also is permitted to notify third parties that "the Facility is no longer associated with the Chain."

Section 17 covers legal matters. Section 17.4 provides that the "non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement." Section 17.6.1 provides that New Jersey law governs the construction of the License Agreement.[3]

Section 17.7 contains "special acknowledgments" by the parties and disclaimers. For example, in § 17.7.1, Honeysuckle agreed that it had "received our Uniform Franchise Offering Circular ('UFOC') for prospective licensees at least 10 business days before ... signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us." [4]

Section 17.7.2 provides that Honeysuckle expressly disclaims that it has relied on

---

3. The parties do not dispute the application of New Jersey law to this action.

4. The UFOC states: "WE DO NOT FURNISH OR AUTHORIZE OUR SALES PERSONS TO FURNISH ANY ORAL OR WRITTEN INFORMATION CONCERNING ACTUAL, PROJECTED OR POTENTIAL COSTS, EX-

any oral and written communications from Travelodge that are not contained in writing in the License Agreement:

Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

Section 17.7.3 states:

This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

Section 17.7.4 provides:

You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

### C. *Honeysuckle's Operation of a Travelodge*

According to a March 29, 2001 letter from Travelodge to Richardson, franchise fees, and Honeysuckle's access to Travelodge's central reservations were to begin on April 1, 2001. (Exhibit G to Darby Aff.)

By letter dated August 21, 2001, Travelodge notified Richardson that the Facility had not filed its monthly revenue reports from April through July 2001, and that Honeysuckle owed approximately $35,912.91 in unpaid fees. (Exhibit C to Compl.)

By letter dated September 28, 2001, Travelodge's Legal Department wrote Richardson, informing him that: "Honeysuckle has failed to remit royalties and other fees in accordance with the terms of the License Agreement since April 2001. Accordingly, the Facility has been restricted from the Central Reservation System since August 16, 2001." In this letter, Travelodge also advised Honeysuckle that it had until October 12, 2001 to make past due payments, or it would "have no alternative" but to forward the matter to outside litigation counsel and possibly terminate the License Agreement. (Exhibit C to Compl.)

In a letter dated December 18, 2001, Richardson informed Travelodge that he "had given numerous notices to you through the various departments and officers of your company that Travelodge has not, nor ever has, honored the agreement between Honeysuckle Enterprises, Inc. and Travelodge." He asserted that Honeysuckle "had never been put 'on line' as were supposed [sic] to be in April or the following months." In his letter, Richardson states that, because Travelodge had defaulted on the License, he had terminated the contract "from a lack of response" from Travelodge. Moreover:

"SIMPLY PUT, TRAVELODGE HAS NEVER PERFORMED ON THE CONTRACT FROM THE BEGINNING. This property was ready for business as a Travelodge on April 1, 2001 as required. Travelodge was not ready for us and failed to properly enter Honeysuckle Inn into the Travelodge system in order that we might receive reservations ... After months of requesting, pleading, and talking to various Travelodge agents, I gave up and terminated the contract."

(Exhibit D to Compl.)

By letter dated January 4, 2002, Travelodge acknowledged receipt of Honeysuck-

PENSES OR PROFITS OF A PROPOSED FACILITY." (Exhibit E to Darby Aff.)

le's letter stating that it had ceased to operate as a Travelodge on or about December 18, 2001. Travelodge wrote, "Please consider this letter as Travelodge's notice of termination as required under Section 11.2(2) of the License Agreement." It further advised Honeysuckle that, due to the "premature termination" of the License Agreement, Honeysuckle was obligated to pay liquidated damages in the amount of $50,000, pursuant to Section 18.3 of the License Agreement, and otherwise comply with post-termination obligations. (Exhibit E to Compl.)

By letter dated March 18, 2002, Travelodge informed Richardson that it sought payment under the Guaranty, based upon Honeysuckle's premature termination of the License Agreement. (Exhibit F to Compl.) It sought payment of $50,000 in liquidated damages and $82,722.35 in outstanding Recurring Fees by April 5, 2002.

### C. *Pleadings and Requested Relief*

Plaintiff has filed a six count complaint, and seeks summary judgment only as to Counts 2, 4, and 6. Count 2 seeks liquidated damages in the amount of $50,000, based on Honeysuckle's termination of the License Agreement. Count 4 seeks $81,566.80 in unpaid Recurring Fees, which Honeysuckle allegedly should have paid but did not pay from April through October 2001, when it operated its Honeysuckle Inn as a Travelodge hotel. Count 6 alleges Richardson's breach of the Guaranty, for failure to pay the liquidated damages and Recurring Fees allegedly owed to Travelodge, or otherwise cause Honeysuckle to perform its obligations under the License Agreement.[5]

Defendants Honeysuckle and Richardson have counterclaimed for: (1) fraudulent inducement of contract; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; (4) fraudulent and/or negligent misrepresentation; (5) unconscionability; (6) equitable/promissory estoppel; and (7) tortious interference with contractual relations.

### STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere

---

**5.** The parties treat the issues regarding liability under the License Agreement and under the Guaranty together in their briefs, since Richardson's liability in the Guaranty arises from Honeysuckle's failure to satisfy liability under the License Agreement. Accordingly, this Court shall treat these issues together in this Opinion.

allegations or denials of its pleadings. *See Sound Ship Bldg. Co. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Wahl v. Rexnord Inc.,* 624 F.2d 1169, 1181 (3d Cir.1980).

### DISCUSSION

For the reasons set forth below, Plaintiff's motion for summary judgment on Counts 2, 4, and 6 of its complaint is denied. In addition, Plaintiff's motion for summary judgment on the counterclaims is granted in part and denied in part.

Before turning to the merits of each of Travelodge's motions, however, this Court first must determine the boundaries of the record for consideration. Specifically, this Court must decide whether it is appropriate to consider evidence of the parties' prior oral or written communications, when the "parol evidence rule prohibits the introduction of oral promises to alter or vary an integrated written instrument." *Shree Ganesh, Inc. v. Days Inns Worldwide,* 192 F.Supp.2d 774, 781 (N.D.Ohio) (quoting *Ocean Cape Hotel Corp. v. Masefield Corp.,* 63 N.J.Super. 369, 164 A.2d 607, 611 (1960)) (applying New Jersey law). In deciding a motion for summary judgment, a court may consider affidavits as well as "exhibits and other papers that have been identified by affidavit **or otherwise made admissible** in evidence." *See Pollack v. City of Newark,* 147 F.Supp. 35, 39 (D.N.J.1956) (emphasis added). The particular issue before this Court is whether evidence of prior oral or written communications between the parties is "otherwise admissible" and properly considered at trial or by a court on a motion for summary judgment, or whether the parol evidence rule bars consideration of prior communications where, as here, the contract purports to be a "final" agreement between the parties.

This Court concludes that the parol evidence rule does not bar evidence of prior oral communications between the parties, notwithstanding the integration clause and disclaimer of reliance in the License Agreement. In New Jersey:

It is well-settled that a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract ... while the parol evidence rule operates to prohibit the introduction of oral promises to alter or vary an integrated written instrument, parol proof of fraud in the inducement is not considered as either additional or substitutionary but rather as indicating that the instrument is, by reason of the fraud, void or voidable.

*See Ocean Cape Hotel Corp. v. Masefield Corp.,* 63 N.J.Super. 369, 164 A.2d 607, 611 (1960).

Of course, the parol evidence rule exception for claims of fraud is not without limits. New Jersey courts distinguish between "fraud regarding matters expressly addressed in the integrated writing and fraud regarding matters wholly extraneous to the writing." *See Filmlife, Inc. v. Mal "Z" Ena, Inc.,* 251 N.J.Super. 570, 598 A.2d 1234, 1236 (1991). Stated another way:

The alleged oral misrepresentations, being contradictory of the undertakings expressly dealt with by the writings, are not effectual in that circumstance to avoid the obligation he knowingly as-

sumed. The general rule is clear that a parol agreement which is in terms contradictory of the express words of a contemporaneous or subsequent written contract, properly interpreted, necessarily is ineffectual and evidence of it inadmissible, whether the parol agreement be called collateral or not.

*Id.* (internal citations and quotations omitted). *See also Peterson v. Mister Donut of America, Inc.*, No. 87–3205, 1988 WL 71734, at *5 (D.N.J. July 6, 1988) ("While parol evidence ordinarily is admissable [sic] to establish fraud in the inducement of a contract, specific disclaimers in the contract of the representations purportedly relied on will defeat the fraud claim.") (quoting *Chromalloy Am. Corp. v. Universal Housing Systems*, 495 F.Supp. 544, 552 (S.D.N.Y.1980)).

This Court concludes that the exception to the parol evidence rule for fraud claims applies in the instant case. The License Agreement provides: "Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement." (§ 17.7.2.) Because the disclaimers of reliance in the License Agreement are not sufficiently specific to warrant limiting the exception here, evidence of such communications should be considered by the Court.

### I. *Plaintiff's Motion for Summary Judgment on Counts 2, 4, and 6*

Counts 2, 4, and 6 of the complaint all rest upon the premise that the License Agreement is a valid agreement and that the conditions for default and breach by Honeysuckle, as set forth in the License Agreement, have been met. These claims request different forms of relief in connection with the default or breach.

Plaintiff asserts that there is no genuine issue of material fact as to whether Honeysuckle defaulted on the License Agree-

ment. It is undisputed that the effective opening date for the Honeysuckle's Travelodge hotel was April 1, 2001. (Darby Aff. ¶ 21; Exhibit G to Darby Aff.; Deposition Transcript of Ryan Richardson dated May 15, 2003 ("Richardson Dep. Tr."), at 41:22–24.) Plaintiffs argue that it also is undisputed that Richardson operated the Honeysuckle Inn as a Travelodge until October 2001. Furthermore, there is testimony in the record reflecting Defendants' admission that, between April and October 2001, when Honeysuckle operated a Travelodge hotel, it never paid any Recurring Fees to Travelodge. (Richardson Dep. Tr. at 110–111.)

■ Defendants assert that they cannot be required to pay the Recurring Fees (or other liquidated damages or costs) associated with the License Agreement for at least two reasons. First, Defendants argue that they should not be held to the terms of an agreement that is voidable due to fraud. Second, they contend that their performance under the License Agreement was excused by Travelodge's material breach of the contract. This Court agrees that there are genuine issues of material fact—regarding whether the License Agreement is voidable, and whether Travelodge materially breached the License, thereby excusing Defendants' performance—that preclude summary judgment for Travelodge.

■ First, if Defendants prevail on their fraud in the inducement counterclaim against Travelodge, the contract is voidable, and its terms could not be enforced. To establish a counterclaim of fraudulent inducement, Defendants will have to show that Travelodge made a misrepresentation of a material fact, which was false and known to be false when made, made for the purpose of inducing the other to rely on it, actual and reasonable reliance on the misrepresentation, and resulting harm.

*See Ramada Franchise Systems, Inc. v. Polmere Lodging Corp.*, No. 98–2809(WGB), at 6 (D.N.J. July 30, 1999) (citing *Lightning Lube, Inc. v. ·Witco Corp.*, 4 F.3d 1153 (3d Cir.1993)). Although "a promise to do something in the future will not normally suffice ... [w]here a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud." *Id.* at 6–7. Richardson's deposition testimony creates genuine issues of material fact as to his fraud in the inducement counterclaim, and should he prevail on this counterclaim at trial, the License Agreement may be voidable. (Richardson Dep. Tr. at 74–76.) Summary judgment on remedies set forth in the License Agreement cannot be granted to Travelodge if a reasonable fact finder concludes that the Agreement may be voidable.

Furthermore, Defendants' claims for breach of contract also prevent this Court from concluding that Travelodge is entitled to summary judgment on Counts 2, 4, and 6. "It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance ... Whether conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions." *See Magnet Resources, Inc. v. Summit MRI, Inc.*, 318 N.J.Super. 275, 723 A.2d 976, 981 (1998).

Here, there are genuine issues of material fact as to whether Travelodge failed to place Honeysuckle on its reservations system, and whether such failure was a material breach, such that Honeysuckle should be excused from performing its obligations to pay Recurring Fees to Travelodge. Section 4.2 of the License Agreement contemplated Honeysuckle's "participation" on the reservations system. Richardson testified that he tested the reservations line between April and October 2001, and discovered that the Honeysuckle Inn was not listed along with other area Travelodge franchisees. (Richardson Dep. Tr. at 113:20–114:14.) This, of course, is contradicted by Honeysuckle's letter dated August 21, 2001, which informs Honeysuckle that its access to the reservations system had been suspended, effective August 16, 2001—a proposition that suggests that Honeysuckle actually was on Travelodge's reservation system at one point in time. Viewed as a whole, the factual record reveals that there are genuine issues for trial.

Plaintiff relies heavily upon *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371 (3d Cir.1992), in support of its claim that it had the unilateral right to terminate the License Agreement and to seek liquidated damages and unpaid Recurring Fees, regardless of Defendants' affirmative defenses or counterclaims. It ostensibly bases this argument on the following text in *S & R Corp.*:

> Though there are no cases directly on point in this circuit, we hold by reference to contract and trademark principles that a franchisor's right to terminate a franchisee exists independently of any claims the franchisee might have against the franchisor. The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated.

*S & R Corp.*, 968 F.2d at 375.

This case, however, is inapposite. *S & R Corp.* involved a franchisor that sought preliminary injunctive relief on a trademark infringement claim, after it had terminated the ·franchise agreement. The franchisor alleged that its franchisee continued to use its trademark in violation of the post-termination obligations, and sought to enjoin use of its trademark.

The Court provided that, upon a sufficient showing that the franchisor's termination of the franchise agreement was proper, preliminary injunctive relief might be warranted. *Id.* Thus, *S & R Corp.* was primarily concerned with whether the franchisor was entitled to preliminary injunctive relief on a trademark claim, and from this vantage point, discussed the likelihood that the franchisor's termination of the franchise agreement was proper.

It is true that *S & R Corp.*, applying New Jersey law, explained:

> [W]hen one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits. Other courts have noted this exact dilemma in resolving franchise termination disputes.

*Id.* at 376 (citing *Burger King v. Austin,* Bus. Fran. Guide (CCH) ¶ 9788 at 22,069 (S.D.Fla.1990)).[6] Ultimately, however, *S & R Corp.* concluded that, where the franchise agreement "gives the franchisor the power to unilaterally terminate the agreement under certain conditions, and those conditions exist, pre-termination complaints *are not relevant to infringement*

*under the Lanham Act." Id.* at 377 (emphasis added).

Again, the factual circumstances, and the legal issue that the Court of Appeals was resolving in *S & R Corp.* differ sufficiently from the instant case as to not be controlling. Based on these genuine issues of material fact, a reasonable jury could conclude that Defendants are not liable for Recurring Fees and other relief sought by this motion, either because Defendants' fraud claims render the License Agreement voidable or because their performance was excused by a material breach by Travelodge. Accordingly, the motion for summary judgment on these counts must be denied.

## II. Motion for Summary Judgment on Defendants' Counterclaims [7]

Based on a review of the parties' submissions, and for the reasons set forth below, this Court concludes that Plaintiff's motion for summary judgment is granted as to Counts 5 (unconscionability) and 7 (tortious interference with contract), and denied as to all other counts of the Defendants' counterclaim.

### A. Fraud in the Inducement of Contract (Count 1); Fraudulent and Negligent Misrepresentation (Count 4); Equitable/Promissory Estoppel (Count 6)

Travelodge seeks summary judgment on Counts 1, 4, and 6 of Defendants' counter-

---

**6.** To the extent that *S & R Corp.* is applicable to the facts before this Court, there appears to be a genuine dispute, in Defendants' view, as to whether Honeysuckle actually was receiving "benefits" under the contract after it apparently had terminated the License Agreement. Based on this factual dispute, a jury might conclude that Defendants had not done what is proscribed by *S & R Corp.*—"stopped" performance of their obligations, while simultaneously "benefiting" from Travelodge's performance of its obligations. *S & R Corp.* fails

to persuade this Court that summary judgment on Counts 2, 4, and 6 is warranted.

**7.** Plaintiff seeks "dismissal" of the counterclaims pursuant to Rule 56 of the Federal Rules of Civil Procedure. As Rule 56 provides for summary judgment, and not "dismissal" of claims, this Court shall treat this motion as one for summary judgment on the counterclaims. *See Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 121 n. 2 (3d Cir. 1999).

claim. (Answer & Counterclaim dated August 13, 2002 ("Countercl."), at ¶¶ 41–46.) The essence of these claims, according to Defendants, is that Travelodge made misrepresentations concerning the number of reservations that could and would be referred to Honeysuckle through Travelodge's reservations system in order to induce Honeysuckle to enter into the License Agreement. (Countercl.¶¶ 41–46.)

■ Count 1 seeks relief for fraud in the inducement of contract.[8] Count 4 asserts negligent and fraudulent misrepresentation. Under New Jersey law, "the element of reliance is the same for fraud and negligent misrepresentation." In order to establish a claim for negligent misrepresentation, a plaintiff must show that "[a]n incorrect statement, [was] negligently made and justifiably relied on ...." See *Kaufman v. i–Stat Corp.*, 165 N.J. 94, 754 A.2d 1188, 1195 (2000).

■ Count 6 asserts counterclaims for promissory and equitable estoppel. The elements of promissory estoppel are: (1) a clear and definite promise, (2) made with the expectation that the promisee will rely upon it, and (3) reasonable reliance upon the promise, (4) which results in definite and substantial detriment. See *Lobiondo v. O'Callaghan*, 357 N.J.Super. 488, 815 A.2d 1013, 1020 (2003). Finally, "to establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." See *Knorr v. Smeal*, 178 N.J. 169, 836 A.2d 794, 799 (2003) (citing *Miller*

*v. Miller*, 97 N.J. 154, 478 A.2d 351, 355 (1984)).

■ Plaintiff's motion for summary judgment on these counterclaims should be denied. These counterclaims sound in fraud, and Richardson's deposition testimony create genuine issues of material facts as to whether misrepresentations were made to Richardson, and whether Richardson relied, reasonably, on these misrepresentations.

The License Agreement appears to show that Honeysuckle expressly disclaimed any reliance on any communications not memorialized as a term in the License Agreement. (§ 17.7.2.) In addition to this broad language, § 17.7.4 specifically provided that "no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement."

It may be that these clauses ultimately will be enforced by a reasonable fact finder, but before a fact finder can reach this resolution, there are genuine issues of material fact as to whether the License Agreement, and all of its provisions, are voidable because of the fraud asserted by Defendants. Defendants have pointed to evidence in the factual record that suggests that they could prove these claims and persuade a reasonable jury of their case. Richardson testifies consistently that promises were made about the level of reservations that Travelodge could provide and asserts that, when such promises were

8. The elements for this claim have been set forth above, but are repeated here. To establish a counterclaim of fraudulent inducement, Defendants will have to show that Travelodge made a misrepresentation of a material fact, which was false and known to be false when made, made for the purpose of inducing the other to rely on it, actual and reasonable reliance on the misrepresentation, and resulting harm. See *Ramada Franchise Systems, Inc. v. Polmere Lodging Corp.*, No. 98–2809(WGB), at 6 (D.N.J. July 30, 1999) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir.1993)).

made, the salesmen had no intention of fulfilling that promise.

There also is evidence in the record to suggest that, during the negotiations, he was shown "denial" data concerning reservations "turned away" or "denied" by Travelodge's reservations system because they lacked an additional Travelodge franchisee in the Branson, Missouri area, where Richardson operated. (Richardson Dep. Tr. at 74.) He contends now that such data was represented to be data reflecting reservations turned away, when in fact it merely represented the number of calls received in which an agent was unable to book a reservation. (Def. Br. at 4; Deposition Transcript of Margo Beckwith–Byrne dated May 22, 2003 ("Beckwith–Byrne Dep. Tr."), at 43:1–47.)[9]

Indeed, misrepresentations and reasonable reliance are essential elements of each of the claims asserted in Counts 1, 4, and 6. There is evidence in the record suggestive of misrepresentations as to fact, i.e., what the "denials" constituted, and deposition testimony suggesting that Defendants reasonably relied on these representations. Aside from these genuine issues of fact, these issues also implicate issues of credibility that are not proper for a court to decide on summary judgment.

### B. Breach of Contract and Covenant of Good Faith and Fair Dealing (Counts 2 and 3 )

 In these counterclaims, Defendants assert that "there exist[ed] a Franchise Agreement between Travelodge and Honeysuckle under which Travelodge was given certain obligations." (Countercl.¶ 48.)

Although these counts fail to reveal the particular "obligations" at issue, it is evident from the deposition testimony and argument in the parties' briefs that one of Defendants' key allegations and complaints is that it never was "on line" with Travelodge's reservations system.[10] They contend that participation in the reservations system was a material term in the License Agreement. Based upon a review of the record, there exists a genuine issue of material fact as to whether Plaintiff breached this term, as well as the implied covenant of good faith and fair dealing with respect to this term.

First, it appears from the License Agreement that the parties agreed that Honeysuckle would be placed "on line" with the Travelodge reservations system. Specifically, § 4.2 of the License Agreement provided that the Facility "would participate in the Reservation System, beginning on the opening date, through the term of the contract." A reasonable fact finder could conclude that access to the reservations system ostensibly was in Plaintiff's control, since § 11.4 of the License Agreement granted Travelodge the right to suspend a franchisee's access to the system upon failure to pay or perform under the License Agreement.

There is a dispute as to whether or not Plaintiff breached its obligation to have Defendants "participate" in the reservations system, and its implied covenant to perform on this term in good faith. On the one hand, Travelodge's letter dated

---

**9.** For example, if the same customer called an agent four times and finally booked a room on the fourth call, the first three calls would be counted as "denials."

**10.** Defendants' loudest complaint is that the central reservations system never provided Honeysuckle with 15% of its reservations, the levels allegedly promised to Honeysuckle by Travelodge's salespeople. This alleged promise, however, never made its way into the License Agreement, which, as the parties have agreed, constitutes the final agreement between the parties.

August 21, 2001 appears to suggest that Honeysuckle was on line with the reservations system. The letter informs Honeysuckle that, as of August 16, 2001, Honeysuckle's access to the reservations system was being "suspended" based on its numerous defaults under the License Agreement. One reasonable inference a fact finder might draw is that Travelodge only could have suspended something that previously existed—here, access to the reservations system. The deposition testimony of Richardson, however, suggests that Honeysuckle may not have been placed on the system at all. Richardson testified:

Q. Were you ever put on the reservation system?

A. No.

Q. Never?

A. Never.

Q. Did you ever receive a reservation from the reservation system?

A. Not from the reservation system, no.

Q. What do you mean?

A. I mean, I did not receive a reservation from the reservation system.

Q. Period?

A. Period.

Q. How do you know you were never put on the reservation system?

A. Because I personally called it, my general manager called it. I repeatedly called it, called the 800 number for Travelodge, the reservation system, and we were not there, nor were we on the Internet as promised.

(Richardson Dep. Tr. at 113:20–114:14.) Together, these facts create a genuine dispute of material facts and implicate credibility issues that are not appropriate for this Court to decide on a motion for summary judgment.

To the extent that Honeysuckle received any reservations through Travelodge, the number of reservations referred to the Honeysuckle Inn, as a general matter, also may persuade a fact finder that Travelodge breached its implied promise to perform in good faith its obligations to refer reservations through the reservations system, or through any channel, to Honeysuckle. Richardson testified that Travelodge sent him a "very, very minuscule" number of reservations. In fact, he specifically testified that he received 12 reservations from Travelodge during the period when the contract was effective. (Richardson Dep. Tr. at 176:18–177:16.) A reasonable fact finder could conclude that Travelodge breached an implied covenant to perform in good faith. Plaintiff's motion for summary judgment on Counts 2 and 3 is denied.

### C. Unconscionability (Count 5)

The crux of Defendants' claim of unconscionability is that "Travelodge, by *inter alia*, its conduct, acted unconscionably in dealing with Honeysuckle." (Countercl. ¶ 64.)

Under New Jersey law, unconscionability cases "look for two factors: (1) unfairness in the formation of the contract, and (2) excessively disproportionate terms." *See Sitogum Holdings, Inc. v. Ropes*, 352 N.J.Super. 555, 800 A.2d 915, 921 (2002) (noting that the former is often referred to as "procedural" unconscionability, and the latter as "substantive" unconscionability). Procedural unconscionability includes, among other things, various inadequacies like age, literacy, and lack of sophistication. Substantive unconscionability describes an exchange of promises that is so one-sided as to "shock the conscience" of the court. *See id.* New Jersey acknowledges that:

Most courts have looked for a sufficient showing of both factors in finding a contract unconscionable. Other courts have been satisfied merely by proof of substantive unconscionability, i.e., an exces-

sively disproportionate exchange of material promises. Still other[s] ... have determined that the two elements need not have equal effect but ... creat[e] a "sliding scale" of unconscionability.

*See Sitogum Holdings, Inc.,* 800 A.2d at 921 (internal citations omitted). Based on their pleadings, Defendants appear to assert a claim of only procedural unconscionability, i.e., they do not complain of a particular term of the License Agreement. It appears that this claim arises from the alleged misrepresentations, during the period of negotiations between the parties, by Travelodge salespeople about the access to, and benefits of, its reservations system.

■ Summary judgment should be granted to Travelodge on this counterclaim. Even if this Court assumes that evidence of prior oral statements or promises concerning the reservations system were admissible, no reasonable jury could conclude that Travelodge's conduct was unconscionable, or that the material terms or promises in the License Agreement were substantively unconscionable. Again, Defendants do not appear to be challenging the substance of any particular term in the License Agreement as unconscionable.

Based on this record, no reasonable jury could conclude that the relative positions of the parties or the exchange of material promises, disproportionately favored Travelodge so as to establish unconscionability. This leaves no genuine issue as to a material fact on this counterclaim for a fact finder to resolve. Accordingly, summary judgment is granted in favor of Travelodge.

### D. *Tortious Interference with Contract (Count 7)*

In Count 7, Defendants allege that Travelodge tortiously interfered with a contract that Honeysuckle had entered into with Fairfield Resorts, whereby Fairfield agreed to provide reservations to Honeysuckle. (Countercl.¶¶ 69–73.)

■ The elements of a claim for tortious interference with contractual relations are: "(1) the existence of the contract (or the prospective economic relationship); (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages." *See Velop, Inc. v. Kaplan,* 301 N.J.Super. 32, 693 A.2d 917, 926 (1997) (citing *Printing Mart–Morristown v. Sharp Electronics,* 116 N.J. 739, 563 A.2d 31 (1989)). Malice in this context does not mean "ill will" but rather that "the harm was inflicted intentionally and without justification or excuse." *Id.* (internal citations omitted). On the issue of causation, the "victim need only prove that had there been no interference, there was 'a reasonable probability that the victim of the interference would have received the anticipated economic benefits.'" *Id.*

■ Travelodge is entitled to summary judgment on this counterclaim. Defendants have pointed to no facts in the record which would lead this Court to conclude that there is a genuine issue of material fact for a jury to decide with respect to this counterclaim. Although Travelodge raises the point that both Travelodge and Fairfield are subsidiaries of the same parent corporation, Cendant, ultimately the legal relationship between the three entities—Cendant, Travelodge, and Fairfield—and its import, if any, to Defendants' tortious interference claim need not be reached, because there is no evidence of third-party interference with Honeysuckle's prior agreement with Fairfield.

Defendants point to a statement by a third party in support of their claim that Travelodge may have been involved in Fairfield's decision to dissolve its contract with Honeysuckle, but this statement can-

not defeat Plaintiff's motion. Richardson specifically testified as follows:

Q. What happened to your contract with Fairfield?

A. We had a sign and was to receive rooms and someone called from Cendant and nixed the contract, told them not to send me rooms is my understanding.

Q. Who called from Cendant?

A. I do not know the name of the individual. Might recognize it if I heard it, but I am not even positive that I'd know that.

Q. How do you know someone from Cendant called someone at Fairfield and said don't honor the contract?

A. Because the man who helped draft this contract is Michael Radney. He was a friend of mine. We go to church and I visit together occasionally. My daughter worked for him for some time and we got right down and signed the documents and all of a sudden I get word that they are not going to honor it because if and unless I did not leave the Travelodge system and they knew the situation before we even signed the contract. Mike Radney personally told me that they had received word from much higher up than even the Florida office to not honor the contract. He was sorry, apologized all over himself and still does to this day.

Q. The individual who you contend instructed Fairfield ... who did that person work for?

A. That person worked for, I'm assuming Cendant ...

Q. Do you have any reason to believe this person whose name you don't know who called somebody and said don't honor a contract worked for Travelodge?

A. I don't believe they worked for Travelodge. I believe they worked for Cendant.

Q. Is it your contention that Fairfield breached its obligations to you?

A. I don't think Fairfield had a choice in the matter. They were told by their parent company to dishonor the contract.

(Richardson Dep. Tr. at 163–64.)

First, pursuant to FED. R. CIV. P. 56, this Court can consider affidavits, pleadings and other admissible evidence in determining a motion for summary judgment. It is not clear that the statements that Defendants seek to have this Court consider would not be precluded at trial as inadmissible hearsay. Second, the statement, at best, is vague, and is insufficient to create a genuine issue of material fact for a fact finder. The evidence suggesting that Travelodge interfered with the Fairfield–Honeysuckle contract is insufficient to create a genuine issue of fact. The connection that Defendants seek to draw between the loss of the Fairfield contract, and Travelodge, is wholly unclear. In the absence of any evidence as to a material fact to support an element of this claim, there are no genuine issues for a fact finder to resolve. Summary judgment on this count is granted in favor of Travelodge.

### CONCLUSION

Based on the foregoing, this Court denies Plaintiff's motion for summary judgment on Counts 2, 4, and 6 of the complaint. In addition, this Court denies Plaintiff's motion for summary judgment on Counts 1, 2, 3, 4, and 6, and grants the motion with respect to Counts 5 and 7, of Defendants' counterclaims.