07-4272-cv
Harrington v. Atlantic Sounding Co., Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2008

(Argued: November 24, 2008      Decided: April 16, 2010)

Docket No. 07-4272-cv

--------------------------------------------------------x

FREDERICK J. HARRINGTON, JR.,

   Plaintiff-Appellee,

      - v. -

ATLANTIC SOUNDING CO., INC.,
WEEKS MARINE, INC., and MV
CANDACE, her engines, equipment
and tackle, in rem,[*]

   Defendants-Appellants.

--------------------------------------------------------x

B e f o r e :  WINTER, WALKER, and CALABRESI, Circuit Judges.

   Appeal by Defendants from a judgment entered in the United States District Court for the Eastern District of New York (Nina Gershon, Judge), denying their motion to dismiss or, in the alternative, to stay the district court action and compel arbitration.  On appeal, we VACATE the district court's judgment, concluding that the arbitration agreement in this case was neither unconscionable nor unenforceable as a matter of law.

---

[*]   The Clerk of the Court is respectfully directed to amend the official caption to read "MV CANDACE, her engines, equipment and tackle, in rem."

The case is REMANDED for the district court to consider Plaintiff's remaining contractual defenses.

VACATED AND REMANDED.

Judge Calabresi dissents in a separate opinion.

TODD P. KENYON (Ronald Betancourt, of counsel), Betancourt, Van Hemmen, Greco & Kenyon, New York, NY, for Defendants-Appellants.

JACOB SHISHA, Tabak, Mellusi & Shisha, New York, NY, for Plaintiff-Appellee.

John P. James, Friedman & James LLP, New York, NY (James P. Jacobsen, Vice-Chair, AAJ Admiralty Law Section, Seattle, WA, Ross Diamond, Chair, Admiralty Law Section, American Association for Justice, Mobile, AL, on the brief, Kathleen Flynn Peterson, President, American Association for Justice, Minneapolis, MN, of counsel), for Amicus Curiae American Association for Justice.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiff-Appellee Frederick J. Harrington, Jr., ("Harrington") filed this action in the United States District Court for the Eastern District of New York (Nina Gershon, Judge), against Defendants-Appellants Atlantic Sounding Co., Inc., Weeks Marine, Inc. (Atlantic Sounding's corporate parent), and the vessel MV CANDACE (collectively, "Defendants") pursuant

-2-

to the Jones Act, 46 U.S.C. § 688, seeking recovery for injuries sustained while he was employed as a seaman on the CANDACE. Defendants sought to dismiss the complaint or, in the alternative, to compel arbitration and to stay the district court action, pursuant to a post-injury arbitration agreement between the parties.  Harrington opposed Defendants' motion, arguing that the arbitration agreement, which he signed in return for cash advances against his claim, was unenforceable as the result of intoxication and lack of mental capacity, and because the agreement was unconscionable.

After an evidentiary hearing, the district court determined that the arbitration agreement was unenforceable under New Jersey law due to substantive and procedural unconscionability, and did not address the claims of intoxication and lack of mental capacity.  On appeal, Harrington resists arbitration on the basis that the arbitration agreement is unenforceable as a matter of law under § 6 of the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 56, and alternatively, that the unconscionability finding below was correct under New Jersey law.

We find that FELA § 6 does not apply to seamen's arbitration agreements, and thus the arbitration agreement is

not unenforceable as a matter of law, and that the district court's finding that the arbitration agreement was unenforceable due to unconscionability was erroneous.  Therefore, we vacate the district court's decision and remand to the district court for consideration of Harrington's remaining contractual defenses.

**BACKGROUND**

After more than two years with Weeks Marine as an Able Bodied Seaman, Harrington suffered a back injury in April 2005 while working aboard the CANDACE, a vessel owned and operated by Weeks Marine.  Shortly thereafter, Harrington left the CANDACE to live with his father in Massachusetts and began receiving maintenance payments of twenty dollars per day from Weeks Marine.  Weeks Marine also paid all medical expenses resulting from Harrington's back injury.

In Massachusetts, Harrington's doctor prescribed painkillers and cortisone shots to help him cope with his injury.  At the evidentiary hearing held on the instant motion, Harrington testified that the medications interfered with his concentration and made him drowsy.  He also testified that during this time he was drinking upwards of a half-gallon of vodka every two or three days.  He added that he has a history

of alcohol abuse for which he has undergone substance abuse treatment on several occasions, most recently in March 2006.

Thereafter, Harrington was diagnosed with herniated discs and was told by his doctor that he required lumbar surgery. In early July 2005, he called Weeks Marine to request additional financial support for his injury and upcoming surgery. In response, on July 11, 2005, Harrington received a "Claim Arbitration Agreement" (the "Agreement") from Defendants in the mail. Defendants prepared and signed the Agreement in New Jersey, the location of their principal place of business, and sent it to Harrington for his signature at his father's house in Massachusetts.

The Agreement included the following language (with "You" referring to Defendants and "I" referring to Harrington):

> Although You are obligated to pay maintenance and cure, You are not currently responsible or liable for any other damages under general maritime law, the Jones Act or any other applicable law. Nonetheless, You are prepared to make voluntary advances against settlement of any claim that could arise out of the personal injury/illness claim I have made . . . , provided I agree to arbitrate any such claim under the American Arbitration Association (AAA) Rules . . . . The decision of the arbitrators shall be final and binding on the parties and any United States District Court shall have the jurisdiction to enforce this agreement, to enter judgment on the award and to grant any remedy provided by law in respect of the arbitration proceedings.

(emphasis omitted.)

Under the Agreement, in exchange for Harrington's undertaking to arbitrate his claims, Defendants "agree[d] to advance sixty percent (60%) of the gross wages [Harrington] would have otherwise earned based upon [his] earnings history . . . as an advance against settlement until [Harrington was] declared fit for duty, and/or at maximum medical improvement, and/or October 10, 2005, whichever occurs first."  The Agreement further "credited [the advance] against any settlement [Harrington] might eventually reach with [Defendants] or against any future arbitration award [he] might receive."  Pursuant to the Agreement, Defendants also agreed to advance "up to $750.00 and any deposit for compensation of the arbitrators . . . , subject to subsequent allocation."

A cover letter accompanying the Agreement explained:

> Our company recognizes the value in its long term
> employees and the hardship that can be associated with
> a dramatic income decrease during a period of
> incapacity.  Although we are under no legal obligation
> to advance funds in this type of situation, our towing
> division has approved such voluntary payment in your
> case, so long as you are willing to agree to arbitrate
> any disputes that might arise from this claim.

According to Harrington's affidavit, he was told by Defendants that they "wanted to help [him] out because of [his]

situation," and that the payments made under the Agreement would constitute "an advance against any claim [he] may bring." Pl. Decl. ¶ 9. Harrington also alleges that Defendants "did not tell [him] that [he] was giving up any rights" by signing the Agreement. Pl. Decl. ¶ 9.

On July 18, 2005, Harrington underwent lumbar surgery, and was released from the hospital the next day. On July 23, 2005, Harrington went to a local bank with his father to sign the Agreement and have it notarized. Harrington was still taking painkillers and drinking heavily during his recovery from surgery, and he testified to being in "tough shape" on July 23 because he "was taking medication and . . . had a couple of drinks that day."

The notary read aloud the Agreement's acknowledgment section, which stated, "[o]ther than the promises contained in this agreement, I have been given no other promises to induce me to sign this Claim Arbitration Agreement. I have not been coerced in any way into signing this agreement. I have signed this agreement knowingly and willingly." The notary asked Harrington if he understood what he was signing before she notarized the Agreement. Harrington answered that he did and signed the Agreement. The notary testified that Harrington did

not appear to be drunk when he signed the Agreement, and that she would not have notarized the Agreement if he appeared intoxicated or in any way impaired.  The notary testified, however, that Harrington appeared to be in pain and had to be assisted by his father when sitting down and standing up and that Harrington "appeared disheveled and unke[m]pt," <u>Harrington v. Atl. Sounding Co.</u>, No. 06-cv-2900(ng) (vvp), 2007 WL 2693529, at *2 (E.D.N.Y. Sept. 11, 2007), whenever the notary saw him at the bank and was incoherent whenever he spoke, which was not often.

Pursuant to the Agreement, Defendants sent support checks to Harrington, which Harrington's father cashed for him, ending with the last payment on October 10, 2005.  Because he was still unable to work, Harrington contacted Weeks Marine to request continued payment of sixty percent of his wages until he was fit to return to work.  In response, on December 2, 2005, Weeks Marine sent him the Addendum Claim Arbitration Agreement (the "Addendum").  The Addendum amended the Agreement by extending the partial payment of Harrington's wages until January 10, 2006 and specified that, apart from this amendment, "the prior Claim Arbitration Agreement, executed on July 23, 2005, remain[ed] in full force and effect."  The Addendum, like the Agreement, also

-8-

stated: "I have been given no other promises to induce me to sign this Addendum thereto. I have not been coerced in any way into signing this Addendum agreement. I have signed this Addendum agreement knowingly and willingly."

On December 8, 2005, Harrington, who testified that he was drinking two quarts of vodka and six beers every day at the time he received the Addendum, brought the Addendum to the same notary he had used to execute the Claims Arbitration Agreement. The notary again read the acknowledgment aloud and asked Harrington if he understood what he was signing. Harrington again answered that he did and signed the Addendum. The notary testified that Harrington appeared to be in the same condition on December 8 as on July 23, and that she did not believe him to be intoxicated or impaired, while conceding that she is "not around those type of people," so she "couldn't judge" whether Harrington was intoxicated or impaired. Dep. Tr. 27:9-10, Jan. 29, 2007. The notary testified, however, that Harrington "appeared to be in pain" every time she saw him. Dep. Tr. 28:4.

Defendants terminated Harrington's employment effective January 27, 2006. In June 2006, Harrington filed the instant action. Defendants moved to dismiss the complaint, or in the

alternative, stay the action and compel arbitration pursuant to the Agreement (as amended by the Addendum).

In July 2007, the district court held an evidentiary hearing to determine the validity of the Agreement, and two months later, finding the Agreement invalid, denied Defendants' motion in its entirety. Harrington, 2007 WL 2693529, at *6. The district court assumed that, under § 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, Harrington bore the burden of establishing a basis for not enforcing the Agreement. After observing that, under the FAA, "questions of contractual validity . . . of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA," Harrington, 2007 WL 2693529, at *3 (quoting Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam)) (internal quotation marks omitted) (alteration in original), the district court chose to apply New Jersey law (where Weeks had its principal place of business) instead of Massachusetts law (where Harrington resided) because New Jersey had "the most significant relationship to the arbitration agreements and the employment relationship between the parties," while at the same time noting that "the principles of contract law are fundamentally the same in both states and . . . the application of either state's law

-10-

would yield the same result." Id.

The district court then found the Agreement both procedurally and substantively "unconscionable and therefore unenforceable" under New Jersey law, citing, inter alia, Sitogum Holdings, Inc. v. Ropes, 800 A.2d 915, 921 (N.J. Super. Ct. Ch. Div. 2002) (noting that "[m]ost [New Jersey] courts have looked for a sufficient showing of both [procedural and substantive unconscionability] in finding a contract unconscionable"). Harrington, 2007 WL 2693529, at *4. The district court found that the facts of this case satisfied New Jersey's "sliding scale" approach to unconscionability, under which "a claim of unconscionability can succeed when one form of it, either procedural or substantive, is greatly exceeded, while the other form is only marginally exceeded." Id.

In finding procedural unconscionability, the district court placed "particular significance" on the timing of the original Agreement. Id. The district court noted that Defendants sent Harrington the Agreement three months after his injury, and shortly before he was scheduled to undergo major surgery with "a lengthy recovery." Id. The district court found that Harrington had an "impaired . . . ability to understand the nature and consequences of the document he was signing," that the notary "had doubts about [Harrington's] condition," and that

"[D]efendants were aware of his heavily medicated state" and his financial vulnerability.  Id.  The district court noted that Harrington did not have an attorney, nor was he advised to seek representation when he signed the Agreement, and that the Agreement "fails to set forth the terms in such a way that an average person would understand its substance."  Id. at *5.  The district court concluded that "all of the facts demonstrate that [Harrington] was in a substantially weaker bargaining position than [Defendants]," and that the Agreement was therefore procedurally unconscionable.  Id.

With respect to substantive unconscionability, the district court found "startling" the provision in the Claims Arbitration Agreement (incorporated by reference into the Addendum) that provided that Defendants "are not currently responsible or liable for any other damages under general maritime law, the Jones Act or any other applicable law."  Id.  The district court concluded that

> [s]uch misleading contractual language, especially when reviewed by a layperson without the benefit of legal counsel, creates the false impression that defendants are not subject to liability for any damages; if that is the case, then plaintiff, by signing the Agreement, is giving up nothing but obtains the wages he so badly needs.  Put another way, defendants asked plaintiff to sign an agreement which purports to eliminate any prospect of liability.

*Id.*

The district court rejected Defendants' argument that Harrington had ratified the Agreement by accepting the support payments, concluding that, because Harrington "was unaware of his legal rights and the unconscionable nature of the Agreement" when he accepted the payments, "there was no ratification." *Id.*

Defendants appealed to this court.[1]

**DISCUSSION**

**I.   Legal Standards**

We review de novo a district court's denial of a motion to compel arbitration. Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995). "The determination of whether parties have contractually bound themselves to arbitrate a dispute [is] a determination involving interpretation of state law [and, hence] a legal conclusion also subject to de novo review." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002); accord Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996). However, "[t]he findings upon which that conclusion is based . . . are factual and thus may not be overturned unless clearly

---

[1] The defendants have withdrawn that part of their appeal that challenges the district court's rejection of their motion to dismiss Harrington's in rem claim against the CANDACE.

-13-

erroneous." Specht, 306 F.3d at 26.

**II. Is The Agreement Invalid As A Matter Of Law Under The FELA?**

Harrington, assisted by amicus curiae American Association for Justice (the "AAJ"), argues that the Agreement is invalid as a matter of law because it violates the FELA as incorporated by the Jones Act. Specifically, Harrington and the AAJ contend that the Agreement eliminated "the seaman's choice to try his case to a federal judge or jury, or a state court judge or jury," and "grants the defendant 'immunity' from suit in all of these forums," in violation of the FELA. Amicus Curiae Br. at 16. We disagree.

The Jones Act, which provides the basis for Harrington's personal injury suit, states in relevant part:

> A seaman injured in the course of employment . . . may
> elect to bring a civil action at law, with the right
> of trial by jury, against the employer. Laws of the
> United States regulating recovery for personal injury
> to, or death of, a railway employee apply to an action
> under this section.

46 U.S.C. § 30104. Interpreting this language, the Supreme Court held that "the Jones Act adopts 'the entire judicially developed doctrine of liability' under the [FELA]." Am. Dredging Co. v. Miller, 510 U.S. 443, 456 (1994) (quoting Kernan v. Am. Dredging Co., 355 U.S. 426, 439 (1958)).

-14-

Harrington and the AAJ argue that FELA §§ 5 and 6 render the Agreement unenforceable as a matter of law. FELA § 5 provides that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." 45 U.S.C. § 55; see Duncan v. Thompson, 315 U.S. 1, 7 (1942) (holding that FELA § 5 applies to post-injury agreements).

FELA § 6 provides, in relevant part:

> Under this chapter an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action. The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of the several States.

45 U.S.C. § 56. FELA § 6 embodies "the plaintiff's right to bring a[] FELA action in state court." Burnett v. N.Y. Cent. R.R. Co., 380 U.S. 424, 434 (1965); see Engel v. Davenport, 271 U.S. 33, 37–38 (1926). Although the non-removal language has been amended out of 45 U.S.C. § 56 since its enactment, similar language in 28 U.S.C. § 1445(a) applies to the FELA and renders Jones Act cases non-removable. See Cal. Pub. Employees' Ret.

Sys. v. Worldcom, Inc., 368 F.3d 86, 99 (2d Cir. 2004).[2]

In Boyd v. Grand Trunk Western Railroad Co., the Supreme Court invoked FELA § 5 to invalidate an agreement limiting an injured party's "right to bring the suit in any eligible forum," a right which the Court found to be guaranteed by FELA § 6. 338 U.S. 263, 265 (1949) (per curiam). In Boyd, the defendant railroad advanced Boyd money after Boyd was injured while working for the railroad. Id. at 263. In return, Boyd signed an agreement stating that if he brought suit, "such suit shall be commenced within the county or district where I resided at the time my injuries were sustained and not elsewhere." Id. at 263-64. Boyd subsequently filed suit in Superior Court, Cook County, Illinois, which was not one of the stipulated venues. Id. at 264. When the railroad sought to enforce the venue agreement, the Supreme Court "agree[d] with those courts which have held that contracts limiting the choice of venue are void

---

[2] We assumed without discussion in Worldcom that FELA § 6 applies to Jones Act cases, see 368 F.3d at 99, even though, when Worldcom was decided in 2004, the Jones Act included its own venue clause, see Terrebonne v. K-Sea Transp. Corp., 477 F.3d 271, 281 (5th Cir. 2007) (citing 46 U.S.C. App. § 688(a)). However, in 2008, Congress amended the Jones Act by deleting its venue clause, see National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3 (2008) (codified as amended at 46 U.S.C. § 30104), thereby confirming our assumption in Worldcom that § 6 applies to Jones Act cases.

-16-

as conflicting with the [FELA]." Id. at 264-65. The Court concluded that the agreement at issue was unenforceable as a matter of law because

> petitioner's right to bring the suit in any eligible forum is a right of sufficient substantiality to be included within the Congressional mandate of [FELA § 5]. . . . The right to select the forum granted in [FELA § 6] is a substantial right. It would thwart the express purpose of the [FELA] to sanction defeat of that right by the device at bar.

Id. at 265-66.

Building upon Boyd, the AAJ and Harrington argue that arbitration agreements like the one at issue in this case deprive workers of their statutorily protected forum-selection rights and are invalid as a matter of law. They contend that "[t]he agreement in the instant case is more egregious than that in Boyd because at least in Boyd the worker could still pick some federal or state courts in which to file his case." Amicus Curiae Br. at 13.

Harrington and the AAJ read FELA § 6 far too broadly, and fail to properly distinguish Boyd from this case. Boyd "[was] not decided under the FAA, which . . . reflects a liberal federal policy favoring arbitration agreements." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991) (internal quotation marks omitted); see also Shearson/Am. Express Inc. v.

-17-

McMahon, 482 U.S. 220, 226 (1987) ("The [FAA] . . . establishes a federal policy favoring arbitration.") (internal quotation marks omitted). As the Fifth Circuit recognized in Terrebonne v. K-Sea Transportation Corp., 477 F.3d 271, 283 (5th Cir. 2007), when Boyd was decided six decades earlier, "[t]here was no federal statute authorizing or providing for the enforcement of the type of agreement involved in Boyd."

The FAA broadly applies to "maritime transaction[s]" and "commerce," and provides that "an agreement in writing to submit to arbitration an existing controversy arising out of" maritime transactions or commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2. Although the FAA exempts from its coverage "contracts of employment of seamen," id. § 1, the Supreme Court has strongly suggested that arbitration agreements such as the one at issue in this case do not constitute "contracts of employment" where the arbitration agreement is "not contained" in a broader employment agreement between the parties, Gilmer, 500 U.S. at 25 n.2; see also Terrebonne, 477 F.3d at 279 (holding that the "maintenance and cure" provisions of an arbitration agreement, though "an intrinsic part of the employment relationship, [are] separate

-18-

from the actual employment contract") (emphasis in original); cf. Nunez v. Weeks Marine, Inc., No. 06-3777, 2007 WL 496855, at *3 n.4 (E.D. La. Feb. 13, 2007) (noting that, in Gilmer, the Supreme Court "d[id] not broadly define 'employment contract' as any contract that has some connection or relation to a party's employment"). Moreover, the Supreme Court has recognized that if the term "contracts of employment" was read so broadly as to include independent arbitration agreements, then every seamen contract would be exempt from the FAA, thereby rendering "the separate exemption for 'contracts of employment of seamen . . . ' pointless." Circuit City Stores v. Adams, 532 U.S. 105, 113 (2001) (quoting 9 U.S.C. § 1). Thus, "[h]ere, in contrast to Boyd, the FAA is involved and thus the issues 'must be addressed with a healthy regard for the federal policy favoring arbitration.'" Terrebonne, 477 F.3d at 283 (quoting Gilmer, 500 U.S. at 26) (emphasis in original).

In addition, § 6, by its terms and purpose, is inapplicable to arbitration agreements. Section 6 says nothing about arbitration agreements. Although "mandatory arbitration clauses are [currently] prevalent in a broad collection of contracts," George Watts & Son, Inc. v. Tiffany & Co., 248 F.3d 577, 583 (7th Cir. 2001), at the time § 6 was enacted, arbitration was

-19-

not a commonly used mechanism "to adjudicate [employee] rights,"
id.; indeed, § 6 was enacted in 1910, see Baltimore & O.R. Co. v. Kepner, 314 U.S. 44, 49 (1941), fifteen years before the FAA was enacted, see Circuit City Stores, 532 U.S. at 111. FELA § 6 therefore cannot reasonably be read to include a blanket prohibition on seamen arbitration agreements when, at the time of enactment, that provision did not contemplate, either in letter or spirit, the existence of an arbitral forum.

In fact, as the AAJ notes, § 6 was enacted by Congress, not in order to invalidate employee arbitration agreements, but "so that [FELA] suit[s] may be tried in a forum that was convenient for the worker." Amicus Curiae Br. at 7. Without the inclusion of § 6, FELA (and hence, Jones Act) trials

> [m]ay be at a place in a distant State from the home
> of the plaintiff, and may be a thousand miles or more
> from the place where the injury was occasioned. The
> extreme difficulty, if not impossibility, of a poor
> man who is injured while in railroad [or seaman]
> employ securing the attendance of the necessary
> witnesses at such a distant point makes the remedy
> given by the law of little avail under such
> circumstances.

Amicus Curiae Br. at 7-8 (quoting H.R. Rep. 513, 61st Cong. 2d Sess. 6 (1910)); see also Kepner, 314 U.S. at 49-50; cf. Lewis v. Texaco Inc., 527 F.2d 921, 924 (2d Cir. 1975) (describing the "solicitude" that should be afforded seamen in order "to

-20-

safeguard seamen's rights") (internal quotation marks omitted).[3]

Therefore, the purpose of § 6 is to ensure the existence of a practical and convenient forum to adjudicate the employee's rights, not to ensure the existence of a particular type of forum.[4] Similarly, the "substantial right" referred to in Boyd was not the worker's right to bring litigation in a judicial forum, but his right to have his claims adjudicated in an

---

[3] At best, it is unclear to what extent the "solicitude" afforded to seamen, which resulted in the extension of the FELA to seamen and the carve-out exception for seamen employment contracts from the FAA, still holds true today. See Ammar v. United States, 342 F.3d 133, 146 (2d Cir. 2003) ("The modern reality is that most seamen are no longer 'friendless'; rather, they have gained strength through collectivity, and they are a well-organized work force with sophisticated leaders who constantly press for better working conditions, pay, and benefits, as well as increased job security. Thus, the need for judicial intervention to protect seamen has been substantially lessened.").

[4] Contrary to the suggestion made in Judge Calabresi's dissent, this understanding of the purpose of § 6 is not "hard to understand" in light of the Supreme Court's bar on state courts' enjoining that state's citizens from "suing railroad companies in the state courts of another state or in federal district court of another state." Dissent of J. Calabresi at **[14]** (emphasis in original). The dissent's puzzlement derives from the assumption that a plaintiff's home state is always the most convenient state for litigation. The Jones Act and FELA, however, recognize that this may not always be the case, and therefore explicitly allow a plaintiff to choose one of several states in which to initiate his suit. That choice is preserved by the arbitration clause in this case, leaving us with only a contractual preference for an arbitral forum–a preference with no implications for the plaintiff's substantive rights. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985).

"eligible forum."  338 U.S. at 265.  An arbitral forum is not only an "eligible forum" where Harrington can adjudicate his rights; under the FAA, it is also a favored one.  The Agreement does not deprive Harrington of his right to adjudicate his claims, it only shifts his right to adjudication to an arbitral forum, without geographical constraints.[5]

---

[5]    Although purporting to discuss the relationship between the Jones Act and the later-enacted FAA, Judge Calabresi's dissent provides no indication of a Congressional intent to exclude the venue provisions of the Jones Act and FELA from the plain language of the FAA.  Nor does the dissent demonstrate any "inherent conflict between arbitration and the [Jones Act's] underlying purpose." Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 227 (1987).  Although the dissent notes the benefits to Jones Act plaintiffs of choosing their forum, it provides no basis for concluding that the authors of either the Jones Act (as opposed to the authors of certain state workers' compensation provisions) or the FAA would have believed arbitration of disputes to be inherently in conflict with the goals of the Jones Act.  This comes as no surprise in light of the Supreme Court's ruling that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Mitsubishi Motors Corp., 473 U.S. at 628.
     Ultimately, Judge Calabresi tells us that "we should be reluctant to interpret the Jones Act and FELA to cede to the policy of the FAA," because "the underlying rights for workers protected by [those Acts] have been judged non-amenable to private resolution by legislative bodies [i.e., the state legislatures of Montana, South Carolina, Georgia, Iowa, and Wisconsin] conferring analogous rights in the workers' compensation context." Dissent of J. Calabresi at **[20]**.  The FAA's policy of promoting arbitration, however, has been consistently applied to claims under statutes embodying similarly compelling rights and interests. See Shearson/American Exp., 482 U.S. at 242 (applying the FAA's provisions to a civil RICO claim); see also, Mitsubishi, 473 U.S. at 635 ("The importance of the private damages remedy [under the Clayton Act, 15 U.S.C. § 15], however, does not compel the conclusion that it may not be

-22-

Thus, the AAJ's reliance on cases such as Duncan, 315 U.S. 1, Aaacon Auto Transport v. State Farm Mutual Automobile Insurance Co., 537 F.2d 648 (2d Cir. 1976), Krenger v. Pennsylvania Railroad Co., 174 F.2d 556 (2d Cir. 1949), and Nunez v. American Seafoods, 52 P.3d 720 (Alaska 2002), is unpersuasive. Those cases involved, not agreements to submit to an arbitral forum without geographic restriction, but agreements to adjudicate the worker's claims in a specific court or geographic location, see Aaacon, 537 F.2d at 651 (arbitration must occur in New York City); Krenger, 174 F.2d at 557 (employee agreed to bring suit only "in a court sitting within either the state where the injuries were sustained or the state where the plaintiff was then living"); Nunez, 52 P.3d at 720 (employee agreed to bring suit only in federal court in Seattle), or in the case of Duncan, not to bring suit at all without satisfying certain "prerequisites," see 315 U.S. at 3 (employee agreed not to "resort[] to litigation" without refunding monies previously advanced to employee).

Additionally, the AAJ suggests that the proviso in FELA § 5 bars seaman arbitration agreements. The proviso states:

---

sought outside an American court.").

> *Provided*, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought.

45 U.S.C. § 55. The AAJ argues that this language "provides the defendant's sole statutory remedy when it has made advances to an injured seaman" and "does not allow [it] to impose arbitration in exchange for the payments." Amicus Curiae Br. at 18-19. This argument is also unpersuasive. Even assuming that Defendants are "common carriers" (an issue the AAJ does not address), this proviso does not provide that setting off benefits (or even advancing those benefits, before setting them off) renders any specific action, remedy, or forum exclusive. Rather, the proviso's plain language simply ensures that common carriers can set off benefits under certain circumstances.

In concluding that FELA §§ 5-6 and Boyd are inapplicable to seaman arbitration agreements, we align ourselves with all of the courts that have considered the issue. See, e.g., Terrebonne, 477 F.3d at 280-86; Nunez, 2007 WL 496855, at *6 (concluding that Boyd was inapplicable because "this case concerns an agreement to arbitrate and not a forum selection or

-24-

venue clause"); <u>Schreiber v. K-Sea Transp. Corp.</u>, 9 N.Y.3d 331, 338 (2007) ("We reject the analogy because there is a factor here not present in <u>Boyd</u>: the federal policy favoring arbitration."); <u>In re Weeks Marine, Inc.</u>, 242 S.W.3d 849, 858 (Tex. App. 2007) (questioning "the applicability of [<u>Boyd</u>] to this case, in which the issues must be considered with a healthy regard for the federal policy favoring arbitration"). Thus, the Agreement is not unenforceable as a matter of law.

III. Is The Agreement Unconscionable?

Next, Defendants argue that the district court erred in concluding that the Agreement is unconscionable. For the following reasons, we agree.

A. Burden Of Proof

The district court assumed without deciding that Harrington bore the burden of proving that the Agreement was invalid. A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid. See <u>Green Tree Fin. Corp.-Ala. v. Randolph</u>, 531 U.S. 79, 91-92 (2000). However, the Supreme Court has also stated "that the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with

full understanding of his rights." Garrett v. Moore-McCormack Co., 317 U.S. 239, 248 (1942). In discussing this principle, we have noted that "[t]he sweep of the language in Garrett is so broad and the solicitude for seamen so plain that an argument for limiting traditional rule in admiralty regarding seamen's releases cannot be sustained." Lewis, 527 F.2d at 924. Harrington argues that Garrett's burden-shifting rule should apply to this case because the Agreement constitutes a release of his right to a jury trial.

Harrington is incorrect. Garrett's burden-shifting rule does not apply here because, as Defendants correctly note, the Agreement "is clearly not a release of rights, but an agreement to arbitrate those very rights." Appellants' Reply Br. at 9. Harrington's substantive rights arise under the Jones Act. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985). Harrington fails to cite any case law to support his argument that Defendants must affirmatively prove the Agreement's validity. Those cases Harrington cites, see Appellee Br. at 16-19, universally place

-26-

the burden of proof on the party seeking to avoid arbitration, see, e.g., Nunez, 2007 WL 496855, at *8 n.15 ("[T]he burden in Garrett concerned a burden of sustaining release of claims. . . . [R]elease of claims is not an issue here."); Schreiber, 9 N.Y.3d at 340 ("[The] burden [for challenging the enforceability of an arbitration agreement] is not shifted simply because the objecting party is a seaman."). Thus, Harrington bears the burden of proving that the Agreement was invalid under New Jersey law.

B.    Unconscionability

New Jersey "[c]ourts generally have applied a sliding-scale approach to determine overall unconscionability, considering the relative levels of both procedural and substantive unconscionability."[6] Delta Funding Corp. v. Harris, 912 A.2d

[6]    The parties do not challenge the district court's application of New Jersey law to determine the validity of the Agreement. Nevertheless, Harrington argues that, on the basis of Garrett, a New Jersey state court would not apply New Jersey common law in this case, but instead would apply "federal maritime law" to determine the validity of the Agreement. See Appellee Br. at 19-20. Harrington's argument appears to be an oblique reference to the "reverse-Erie doctrine," which "requires that the substantive remedies afforded by" state courts in maritime cases "conform to governing federal maritime standards." Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 223 (1986). We reject this cursory argument, both because Harrington cites no case law to support it, and because, as previously established, Garrett is inapposite to this case. Moreover, given maritime law's silence on this particular issue, the district court correctly applied New Jersey common law principles to determine

-27-

104, 111 (N.J. 2006) (citing Sitogum Holdings, 800 A.2d at 921-22). Procedural unconscionability includes "various inadequacies like age, literacy, and lack of sophistication," while "[s]ubstantive unconscionability describes an exchange of promises that is so one-sided as to 'shock the conscience' of the court." Travelodge Hotels, Inc. v. Honey Suckle Enters., Inc., 357 F. Supp. 2d 788, 801-02 (D.N.J. 2005). Procedural unconscionability typically "does not, by itself, render [an] arbitration agreement unenforceable." Delta Funding, 912 A.2d at 111; see also Sitogum Holdings, 800 A.2d at 921 n.13 ("There do not appear to be any decisions where procedural unconscionability was present but not substantive unconscionability."). As a result, for an agreement to be unconscionable under New Jersey law, it must include an "exchange of obligations so one-sided as to shock the court's conscience." Sitogum Holdings, 800 A.2d at 921; see also Travelodge Hotels, 357 F. Supp. 2d at 802 (granting summary judgment where plaintiff failed to establish that "the material terms or promises in the [agreement] were substantively unconscionable").

In finding the Agreement unconscionable, the district court focused primarily on the Agreement's alleged procedural unconscionability, while finding substantive unconscionability

the validity of the Agreement. See, e.g., Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 n.6 (2d Cir. 2006).

solely based on the provision of the Agreement that stated that Defendants "are not currently responsible or liable for any other damages under general maritime law, the Jones Act or any other applicable law." **Harrington**, 2007 WL 2693529, at *4-5. According to the district court, this language was substantively unconscionable because of its potential to "mislead[] . . . a layperson [who is] without the benefit of legal counsel." Id. at *5.

We disagree with the district court's analysis. First, misleading language in an agreement is relevant to procedural, and not substantive, unconscionability, see Sitogum Holdings, 800 A.2d at 921 (explaining that procedural unconscionability includes, inter alia, an agreement's "hidden or unduly complex contract terms"); thus, the instant provision could only be substantively unconscionable if, as a result of its operation, the Agreement "shock[ed] the court's conscience," id. The instant provision had no such effect – it "impose[d] no substantive obligation on" Harrington, Appellants' Br. at 13, nor did it deprive Harrington of any rights. Instead, the provision only noted that, at the time the Agreement was executed, Defendants were not "currently" liable for any damages, which was true because there had been no finding, or admission, of liability. To be sure, the provision could be read as indicating that there was no basis for liability, but the fact that a

-29-

provision is susceptible to different interpretations does not, without more, make it substantively unconscionable. The remaining provisions of the Agreement were substantively reasonable: Defendants agreed to advance funds to Harrington and Harrington agreed to arbitrate his claims against Defendants. To find this bargain "so one-sided as to shock the court's conscience," Sitogum Holdings, 800 A.2d at 921, would contravene the "liberal federal policy favoring arbitration agreements," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).

Harrington sets forth two additional, unpersuasive reasons for affirming the district court's judgment. First, Harrington's contention that the Agreement is substantively unconscionable because the financial cost of arbitration essentially "extinguish[ed] [his] ability to pursue" his claims, see Appellee Br. at 23, fails because the Rules of Employment for the American Association of Arbitration ("AAA") expressly provide that "[t]he AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees," and Harrington has not explained why the fees would not be deferred or reduced in his case. Moreover, Defendants have agreed to advance all arbitration fees, subject to later allocation by the arbitrator, and Harrington's retainer agreement with his counsel provides for the advancement of all expenses by counsel, presumably including the cost of

arbitration.  Harrington has not established that the cost of arbitration would preclude him from arbitrating his claims.

Harrington's argument that the Agreement was substantively unconscionable because it takes away his right to a trial by jury fails because courts may not "rely on the uniqueness of an agreement to arbitrate," which necessarily waives jury trial, "as a basis for a state-law holding that enforcement would be unconscionable." Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987). It is well-settled that waivers of jury trial are fully enforceable under the FAA. See Gilmer, 500 U.S. at 26; Quijan v. Shearson/American Exp., Inc., 490 U.S. 477, 480-81 (1989); Mitsubishi Motors, 473 U.S. at 628.

Putting aside the question of whether the Agreement was procedurally unconscionable, the district court erred in concluding that the Agreement was substantively unconscionable. Because, under New Jersey law, an agreement must be substantively unconscionable in order to be voided for unconscionability, see Sitogum Holdings, 800 A.2d at 921 n.13, the arbitration agreement entered into by Harrington cannot be voided on that basis.[7]

---

[7]     We note that Judge Calabresi's dissent agrees with our understanding that New Jersey requires some degree of substantive unconscionability in order to void a contract provision. Dissent of J. Calabresi at **[5]**. Judge Calabresi would, however, permit a finding of substantive unconscionability under New Jersey law without a determination that the provision at issue "shocks the conscience." Id. at **[6]** ("I do not believe that conscience-shocking terms are in practice required to find unconscionability in New Jersey in circumstances like those before us.").

**IV. Harrington's Remaining Contractual Defenses**

Harrington also argued to the district court that the Agreement should be voided due to lack of mental capacity and intoxication. See Jennings v. Reed, 885 A.2d 482, 488 (N.J. Super. Ct. App. Div. 2005) ("[T]he longstanding rule is that where there is not the mental capacity to comprehend and understand, there is not the capacity to make a valid contract.") (internal quotation marks omitted); Feighner v. Sauter, 614 A.2d 1071, 1075 (N.J. Super. Ct. App. Div. 1992) (noting that "intoxication" is one of the "usual grounds for rescission" of a contract). Defendants contend that "[t]he [d]istrict [c]ourt rejected sub silentio Plaintiff's defenses of lack of mental capacity and intoxication," Appellants' Br. at 10 n.2, and that therefore we should also reject those defenses on appeal. We discern no evidence of this. The district court made no factual or legal findings with respect to Harrington's lack of mental capacity and intoxication defenses, nor have those issues been briefed on appeal. Accordingly, we remand to the district court for a determination of the merits of Harrington's remaining contractual defenses.

---

Following the standards set forth by the Supreme Court of New Jersey, we require the identification of some "exchange of obligations so one-sided as to shock the court's conscience" before voiding a contract provision. Sitogum Holdings, 800 A.2d at 921. Finding no such one-sided obligation, the arbitration provision cannot be voided under New Jersey law.

In addition, if the district court finds one or both of Harrington's defenses to have merit, it will also be required to reconsider whether Harrington nonetheless ratified the Agreement. Ratification is "the affirmance by a person of a prior act which did not bind him but which was done, or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Martin Glennon, Inc. v. First Fidelity Bank, N.A., 652 A.2d 199, 205 (N.J. Super. Ct. App. Div. 1995) (internal quotation marks omitted). "Ratification requires intent to ratify plus full knowledge of all the material facts. Ratification may be express or implied, and intent may be inferred . . . from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act." Thermo Contracting Corp. v. Bank of N.J., 354 A.2d 291, 296 (N.J. 1976) (internal citations omitted). Therefore, if the district court finds the Agreement voidable due to lack of mental capacity and/or intoxication, the court must then determine whether Harrington cashed Defendants' checks, not only with the "intent to ratify" the Agreement, but with the "full knowledge" of the potential invalidity of the Agreement. Id.

## CONCLUSION

For the foregoing reasons, the district court's judgment is VACATED and the case REMANDED for proceedings consistent with this opinion.

CALABRESI, *Circuit Judge*, dissenting:

I would affirm the District Court's judgment that the post-injury agreement compelling arbitration is in this case unconscionable under New Jersey law. More importantly, I would answer a threshold question differently from the majority and conclude that the arbitration agreement is invalid as a matter of law under the Jones Act, 46 U.S.C. § 30104, and sections 5 and 6 of the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 et seq. Because I believe that the majority's decision to reverse does not take adequate account of the historic importance and purpose of both the Jones Act and FELA, and of their unique protections for specific categories of workers, such as seamen, I respectfully dissent.

**I.**

Plaintiff-Appellee Frederick Harrington ("Harrington") is a former seaman who sustained a serious back injury during the course of his employment with Weeks Marine, Inc ("Weeks Marine" or "Appellant"). After being diagnosed with herniated disks and being told by his doctor that he required surgery, he contacted Weeks Marine to request further financial support that would enable him to finance his surgery. Three months later, and just days before Harrington was scheduled to undergo major surgery—a fact of which the District Court found Weeks Marine was aware—Weeks Marine responded by mailing Harrington a Claim Arbitration Agreement ("Agreement"). In the Agreement, Weeks Marine offered to pay Harrington 60 percent of his gross wages up to a certain time as an advance on a potential settlement, provided that Harrington agree to arbitrate all of his claims.[1] Five days after his surgery, and while under

---

[1] Harrington received this initial Agreement from Weeks Marine on July 11, 2005 and signed it on July 23, 2005. Weeks Marine agreed to make advance payments to Harrington until Harrington was declared fit for duty, reached maximum medical improvement, or October 10, 2005, whichever came first. Therefore, in exchange for Harrington's agreement to arbitrate, Weeks Marine agreed to advance his salary for an amount of time that would at most be less than

1

the influence of large doses of both prescription pain medication and alcohol, Harrington signed the Agreement. The District Court found that Weeks Marine was aware of Harrington's heavily medicated state when he signed the Agreement and was also aware that Harrington was "financially vulnerable": he was an "injured seaman attempting to survive on a mere $20.00 per day" who was living with and being supported by his elderly father. *Harrington v. Atlantic Sounding Co., Inc.*, No. 06-CV-2900, 2007 WL 2693529, at *4 (E.D.N.Y. Sept. 11, 2007).

In addition, Harrington manifestly lacked legal sophistication. When he testified before the District Court, "it was clear that he had difficulty understanding the questions and articulating his responses." *Id.* at *5. The District Court was able to glean from Harrington's testimony that he did not know the meaning of the word "arbitration" and was unfamiliar with his legal remedies under the Jones Act. Rather than helping an employee like Harrington understand the contract he was to sign, the agreement Weeks Marine sent obfuscated as much as it clarified. The Agreement did not use plain English and failed to make clear that, by signing, Harrington waived his right to a jury trial. In fact, the Agreement was framed in a way that could reasonably lead a signatory to believe he was not relinquishing any rights at all: it provided that "[a]lthough [the company was] obligated to pay maintenance and cure" it was not "currently responsible or liable for any other damages under general maritime law, the Jones Act or any other applicable law." J.A. 245. Harrington was never told that he was signing a legal document affecting his rights or told that he might wish to seek the advice of an attorney. In light of this, it is not surprising that Harrington believed that "because he was a good employee," Weeks Marine was simply planning to pay him 60% of his wages until he could return to work, and he did not

three months. When Harrington failed to recover, Weeks Marine did ultimately agree to extend the payments advanced for an additional three months pursuant to an "Addendum Agreement" that in other respects set forth the same terms and conditions as the original Agreement.

2

realize he was being asked to relinquish anything in return. *See* Pl. Decl. ¶ 9. Based on these findings of fact, which we must accept unless they are "clearly erroneous," *see Chelsea Square Textiles*, *Inc. v. Bombay Dyeing and Mfg. Co.*, 189 F.3d 289, 295 (2d Cir. 1999), the District Court concluded that the Agreement requiring Harrington to arbitrate his Jones Act claims was unconscionable under New Jersey law, and accordingly denied Weeks Marine's motion to dismiss or compel arbitration.

I would not reach the issue of unconscionability because I would hold that an Agreement requiring a seaman to arbitrate his Jones Act claim is invalid as a matter of law. *See infra* Part II. But because the majority holds otherwise, the majority addresses the District Court's unconscionability determination and reverses it, concluding that the Agreement was not substantively unconscionable because it does not "shock[] the court's conscience." *See* Maj. Op. at **[27]**. I find New Jersey law far less clear on this question than does the majority. But were I to decide the issue, I would agree with the District Court that the Agreement was unconscionable, even assuming, as the District Court did, that the burden of demonstrating unconscionability is on Harrington.[2]

Central to the majority's holding is its conclusion that New Jersey contract law always requires a showing of significant *substantive* unconscionability in addition to *procedural* unconscionability. While the majority acknowledges that "New Jersey courts generally . . . appl[y] a sliding-scale approach to determine overall unconscionability," the majority ultimately explains that for a contract to be unconscionable under New Jersey law "it must include an exchange of obligations so one-sided as to shock the court's conscience." *See* Maj. Op. at **[24-**

---

[2] It is possible to argue to the contrary. *See Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942) (holding, in the context of a complete relinquishment of rights, that the burden of showing a release was knowing and voluntary lies on the seaman's counterpart).

3

26] (internal quotation marks omitted). I do not understand New Jersey law to establish so formal a test, and instead believe that New Jersey courts' actual application of unconscionability is much more nuanced and case-specific. *See Delta Funding Corp. v. Harris*, 912 A.2d 104, 111 (N.J. 2006) ("The defense of unconscionability . . . calls for a fact-sensitive analysis in each case[.]"); *Lucier v. Williams*, 841 A.2d 907, 911 (N.J. Super. A.D. 2004) ("There is no hard and fast definition of unconscionability); *see also Sitogum Holdings, Inc. v. Ropes*, 800 A.2d 915, 920 n.12 (N.J. Super Ch. Div. 2002) ("It is not possible to *define* unconscionability. It is not a *concept*, but a determination to be made in light of a variety of factors not unifiable into a formula.") (quoting James J. White & Robert S. Summers, Uniform Commercial Code 151 (4th ed. 1996)). Therefore, rather than approaching unconscionability as though it contained discrete elements, New Jersey courts have frequently emphasized, when evaluating contracts of adhesion, that various *factors* must be considered, and these factors have "procedural and substantive aspects." *See Delta Funding Corp.*, 912 A.2d at 111; *Rudbart v. North Jersey Dist. Water Supply Comm'n*, 605 A.2d 681, 687 (N.J. 1992) ("[I]n determining whether to enforce the terms of a contract of adhesion courts have looked . . . to . . . the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract.").

Underlying New Jersey courts' consideration of these various factors appears to be a general concern about asymmetry between contracting parties, which, when this asymmetry rises to a certain level, makes judicial enforcement of a contract unfair. New Jersey's sliding-scale approach to unconscionability reflects a view, first, that this unfairness can manifest itself in a contract's formation and also in its terms, and second, that these two manifestations are interrelated. This seems perfectly sensible. If two parties of relatively equivalent bargaining

4

power negotiate contractual terms, courts will rightly be skeptical when one party later claims that the agreement was so one-sided as to preclude its enforcement. By contrast, when there is overwhelming procedural unconscionability in the formation of a contract, a court may well believe that the contract is unconscionable based on a lower degree of unfairness in the ultimate terms. *See Muhammad v. County Bank of Rehoboth Beach*, 912 A.2d 88, 97 n.3 (N.J. 2006) (indicating that a sliding scale analysis may be appropriate in the context of adhesion contracts and that when a contract involves "overwhelming procedural unconscionability" this should be factored into the unconscionability analysis); *Sitogum Holdings,* 800 A.2d at 923 (endorsing a sliding scale approach to unconscionability, and holding that a claim for unconscionability should not be barred "when one factor [*i.e.* procedural or substantive] is greatly exceeded, while the other only marginally so").

I take as valid the District Court's findings of fact, and based on these findings, I think it is manifest that there was dramatic procedural unconscionability in this case. While this would not in itself render the agreement to arbitrate unenforceable, *see Delta Funding Corp. v. Harris*, 912 A.2d at 111, it does mean that, under New Jersey law, a lesser degree of substantive unfairness than the majority seems to demand suffices to make the Agreement unenforceable. Here, in exchange for an advance against a potential settlement that (under the District Court's findings) was offered in a procedurally outrageous manner, Harrington gave up substantial rights uniquely afforded to Jones Act plaintiffs. Agreeing to arbitration did more than deprive Harrington of a jury trial, which is of course a necessary consequence of all arbitration agreements and so not ordinarily enough to constitute substantive unconscionability. *See Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). Rather, the Agreement deprived Harrington of a whole panoply of important choices, the existence of which reflects the specific decision by Congress

5

to confer significant procedural advantages on seamen under the Jones Act. I will discuss these choices in detail in the section below; for now it is enough to note that they include the ability to elect *unilaterally* between a jury or non-jury trial and to choose—to a degree virtually never seen elsewhere—the forum that he believes to be most favorable in which to bring his claim. *See infra* Part II.

I do not need to decide whether the overall Agreement or any of its individual provisions "shock my conscience" as a judge. For I do not believe that conscience-shocking terms are in practice required to find unconscionability in New Jersey in circumstances like those before us. The question is a close one. And, more than anything, I believe this case demonstrates the general undesirability of giving federal courts the last word on the interpretation of state law in a given case. *See* Guido Calabresi, *Federal and State Courts: Restoring a Workable Balance*, 78 N.Y.U. L. Rev. 1293, 1300 (2003) ("[F]ederal courts often get state law wrong because federal judges don't know state law and are not the ultimate decisionmakers on it."). In its effort to interpret New Jersey law, the majority articulates a rule for contractual unconscionability that the Agreement at issue cannot meet because the Agreement's terms are not "shocking." The majority's interpretation of New Jersey law to require this, even in the face of important procedural unconscionability, is not untenable. But I do not believe it is one that the New Jersey Supreme Court would adopt if we could certify the question to them. Unfortunately, the New Jersey Supreme Court does not accept certification from us.[3] As a result, the majority and I must "guess" as to state law, and we come out in opposite ways.

---

[3] *See* N.J. Court Rule 2:12A-1 ("The Supreme Court may answer a question of law certified to it by the United States Court of Appeals for the Third Circuit, if the answer may be determinative of an issue in litigation pending in the Third Circuit and there is no controlling appellate decision, constitutional provision, or statute in this State."); *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d

In short, while I agree that a contract to arbitrate one's claims would not by itself be deemed substantively unconscionable by New Jersey in the typical case, *see* Maj. Op. at **[28]**, I believe that New Jersey would find Harrington's case not to be typical.

**II.**

This case can, however, also be properly resolved without recourse to any questions of state contract law. Harrington, supported by amicus curiae American Association for Justice ("AAJ"), argues that the Agreement is void as a matter of law. I agree, and consider this an appropriate alternate ground for affirming the District Court's judgment. *See Prisco v. A & D Carting Corp.*, 168 F.3d 593, 610 (2d Cir. 1999) (explaining that we may "affirm the judgment of the district court on any basis for which there is a record sufficient to permit conclusions of law" (quotation marks omitted)).

**A.**

The Jones Act, officially entitled "The Merchant Marine Act of 1920," was enacted to provide a cause of action in negligence for any seaman "injured in the course of employment." 46 U.S.C. § 30104. The Act followed a long tradition of solicitude for the rights and interests of seamen by both legislatures and courts that dates back to the First Congress. *See Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246 (1942) (recognizing "[o]ur historic national policy, both legislative and judicial" directed to the safeguarding of seamen's rights). In an oft-quoted case, Justice Story, sitting on Circuit in 1823, discussed the judicial solicitude accorded to

34, 47 n.6 (2d Cir. 2005) ("[W]ere certification available to us, we might . . . seek guidance from the New Jersey Supreme Court on the matter. But certification of the question to the New Jersey Supreme Court is not an option, because, under Rule 2:12A-1 of that court, certification is accepted by that court only from the Third Circuit.").

seamen in admiralty, and explained how this solicitude should inform a court's interpretation of the contracts into which seamen enter:

> Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel . . . . [C]ourts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty[.] . . . If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that protanto the bargain ought to be set aside as inequitable. . . . And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen.

*Harden v. Gordon*, 11 F. Cas. 480, 485 (Cir. Ct. Me. 1823) (Story, J.).

Growing out of this tradition, the Jones Act sought to fill a remedial gap that existed for the personal injury claims of this group of especially vulnerable workers. General maritime law prevailing prior to the enactment of the Jones Act allowed a seaman to receive "maintenance and cure" from his employer and damages attributable to a ship's unseaworthiness, but did not permit a suit in negligence against either the ship's master or any member of the crew. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (citing *The Osceoloa*, 189 U.S. 158, 175 (1903)). State workers' compensation schemes—which were first adopted in the decade preceding the Jones Act and quickly proliferated despite challenges to their validity, see Dan B. Dobbs & Paul R. Hayden, Torts and Compensation 916 (5th ed. 2005)—might have conceivably filled this gap, albeit non-uniformly. But this possibility was apparently precluded by a series of much-criticized[4] Supreme Court decisions authored by Justice McReynolds prohibiting the application of state compensation laws to maritime workers.[5]

---

[4] *See, e.g.*, *Am. Dredging Co. v. Miller*, 510 U.S. 443, 458-62 (1994) (Stevens, J., concurring in part and concurring the judgment) (referring to the *Jensen* doctrine as "ill-advised" and calling the case "just as untrustworthy a guide in an admiralty case today as *Lochner v. New York* . . .

8

The Jones Act was, therefore, enacted by a Congress a) that recognized seamen as a group meriting solicitude and protection, and b) that also realized that then-current law provided them with inadequate recourse when they suffered injuries resulting from the hazards of their employment.  Hence, the Act removed the bar for a suit based on negligence, defined negligence extremely broadly, and provided seamen with heightened legal protection as workers merited by "their exposure to the perils of the sea."  *Chandris*, 515 U.S at 354 (internal quotation marks omitted).[6]  These protections extended beyond the change in substantive law; the Act provides

---

would be in a case under the Due Process Clause"); Matthew H. Frederick, Note, *Adrift in the Harbor: Ambiguous-Amphibious Controversies and Seamen's Access to Workers' Compensation Benefits*, 81 Tex. L. Rev. 1671, 1706 (2003) ("It has become common sport to catalogue the abuse heaped upon *Jensen* over the years . . . .").

[5] *See S. Pac. Co. v. Jensen*, 244 U.S. 205, 217-18 (1917) (holding that state worker's compensation award to family of a longshoreman killed on an ocean-going ship was unconstitutional because it addressed a subject matter reserved exclusively to Congress and the federal courts); *see also Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 163-64 (1920) (invalidating as an impermissible transfer of legislative power a law passed by Congress in response to *Jensen* intended to permit the application of workers' compensation laws of the several states to injuries within the admiralty and maritime jurisdiction); *State of Washington v. W.C. Dawson & Co.*, 264 U.S. 219, 222-23 (1924) (invalidating on the same ground a similar but more limited federal statute that excluded some maritime workers from its scope).  A contemporaneous opinion by Justice Van Devanter also held that state workers' compensation laws could not be applied to railway employees who were engaging in interstate commerce. *New York Cent. R. Co. v. Winfield*, 244 U.S. 147 (1917).  Relying on a theory of field preemption, the Court concluded that the remedy established by Congress in passing FELA was meant to be exclusive. *See id.* at 151-53.

In 1927, Congress ultimately did adopt its own workers' compensation law, but only for *non-seamen* maritime workers. *See* Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq.; *id.* § 902(3)(G) (excluding "a master or member of a crew of any vessel" from the coverage of LHWCA); *see also Southwest Marine, Inc. v. Gizoni*, 502 U.S. 81, 87 (1991) (describing this provision as a "refinement" of the term "seamen" in the Jones Act).

[6] The majority, relying on dicta from one of our cases, expresses doubt about whether the solicitude traditionally afforded to seaman is still applicable because "[t]he modern reality is that most seamen are no longer 'friendless.'"  Maj. Op. at **[19 n.3]** (quoting *Ammar v. United States*, 342 F.3d 133, 146 (2d Cir. 2003).  Leaving aside the irony of invoking this (ultimately empirical) notion in a case involving a litigant as helpless as Harrington, it is notable that in the passage the majority quotes, the court was addressing a seaman's maintenance claim in the shadow of a

9

seamen plaintiffs with powerful procedural rights, such as the *unilateral* right to elect between jury and non-jury trial.[7]

Many of the Jones Act's rights and protections are conferred by reference to the rights and protections afforded by law to railway employees—another group of workers engaged in an industry that was extremely dangerous, of national importance, and under the aforementioned Supreme Court decision, *see supra* **[9 n.5]**, not readily covered by state workers' compensation laws. *See* 46 U.S.C. § 30104 ("Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section."). As the Supreme Court has explained, this provision of the Jones Act "adopt[ed] the entire judicially developed doctrine of liability under [FELA]." *Am. Dredging Co. v. Miller*, 510 U.S. 443, 456 (1994) (quotation marks omitted). FELA includes several provisions that both provide plaintiffs with significant procedural rights and protect those rights from subversion by counterparties with superior bargaining power. FELA section 6 provides an expansive federal venue provision, 45

---

collective bargaining agreement. *See Ammar* 342 F.3d at 146. Maintenance is a judicially fashioned duty based on general maritime law, *see Wills v. Amerada Hess Corp.*, 379 F.3d 32, 52 (2d Cir. 2004), and federal courts have also been vested with the power to adopt federal common law governing the enforcement of collective bargaining agreements, *see Textile Workers Union of America v. Lincoln Mills*, 353 U.S. 448, 451(1957). By contrast, this case involves *statutory* interpretation, in which case it is the intent of the Congress that enacted the Jones Act that matters. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980). The majority might view as anachronistic the solicitude that Congress in 1920 exhibited toward seamen, but we as federal courts have not been given the power to update supposedly out-of-date statutes, whatever the academic merits of such proposals. *See Hayden v. Pataki*, 449 F.3d 305, 367 (2d Cir. 2006) (in banc) (Calabresi, J., dissenting).

[7] *See* 46 U.S.C. § 30104 ("A seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer."); *Panama R. Co. v. Johnson*, 264 U.S. 375, 392 (1924) (rejecting Fifth Amendment Due Process challenge to Jones Act premised on argument that the Act "permits injured seamen to elect between varying measures of redress and between different forms of action without according a corresponding right to their employers"); *Craig v. Atlantic Richfield Co.*, 19 F.3d 472, 476 (9th Cir. 1994) ("The plain language of the Jones Act gives a plaintiff the option of maintaining an action at law with the accompanying right to a jury trial. The Act makes no mention of a defendant.").

U.S.C. § 56,[8] expressly recognizes concurrent jurisdiction in the state courts, 28 U.S.C. § 1445(a),[9] and bars a defendant from removing FELA claims (and by extension Jones Act claims) to federal court, 45 U.S.C § 56. The combination of these provisions gives the plaintiff in either a FELA or Jones Act case almost limitless forum choices that the defendant cannot disturb. Moreover, FELA section 5 protects the rights established under the Act by declaring void "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter." 45 U.S.C. § 55. In adopting this section, Congress sought to be "comprehensive" by using a "generic, rather than a specific, description." *Philadelphia B. & W. R. Co. v. Schubert*, 224 U.S. 603, 611 (1912); *see also Duncan v. Thompson*, 315 U.S. 1, 6 (1942) (surveying legislative history of FELA and concluding that "Congress wanted Section 5 to have the full effect that its comprehensive phraseology implies").

In *Boyd v. Grand Trunk Western Railroad*, 338 U.S. 263 (1949), the Supreme Court applied FELA section 5 to invalidate a post-injury agreement that, in consideration for a monetary advance, restricted a railroad employee's choice of venue for his FELA action. After explaining that, under FELA section 6, the defendant was liable to suit in the state court in which the plaintiff filed his claim, the Court held that the "right to bring the suit in any eligible forum is a right of sufficient substantiality to be included within the Congressional mandate of s. 5 of [FELA]." *Id.* at 265. Accordingly, the contract limiting plaintiff's choice of venue was declared

---

[8] Specifically, section 6 provides that an action under FELA may be brought in a federal district that is "in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action." 45 U.S.C. § 56. The last of these options makes this venue provision especially broad.

[9] As the majority explains, this "non-removal" language was originally part of FELA section 6, but has subsequently been amended out and has been replaced with language to the same effect in 28 U.S.C. § 1445(a).

11

void under FELA section 5.  To hold otherwise, the Court asserted, would "thwart the express purpose" of FELA by allowing the use of a "device" to defeat plaintiff's "substantial right" granted in FELA section 6 to select the forum.  *Id.* at 266.

I believe that *Boyd* is controlling in this case, and that faithful adherence to that long-established precedent requires that we find the arbitration agreement at issue in this case void as a matter of law.  *The Agreement that Weeks Marine entered into with Harrington is a contract or "device" whose purpose is to deprive Harrington of the substantial right to choose the forum in which to bring his claim.*  The majority tries to distinguish *Boyd*, but its attempt is ultimately unconvincing.

First, *Boyd*'s prohibition on venue selection agreements fully applies to Jones Act cases. This is the plain implication of 46 U.S.C. § 30104, which, as previously noted, has been interpreted to adopt under the Jones Act "the entire judicially developed doctrine of liability" under FELA.  *Am. Dredging Co.*, 510 U.S. at 456 (quotation marks omitted).  Following this clear and comprehensive instruction, we have not hesitated to recognize that rules governing jurisdiction and venue under FELA apply with full force to Jones Act claims.  *See Cal. Pub. Employees' Ret. Sys. v. WorldCom., Inc.*, 368 F.3d 86, 99 (2d Cir. 2004) (acknowledging that Jones Act cases are made non-removable by 28 U.S.C. § 1445(a), which precludes removal to federal court in civil actions "against a railroad or its receivers or trustees"); *see also Nunez v. Am. Seafoods*, 52 P.3d 720 (Ala. 2002) (holding that *Boyd* applies to Jones Act claims and invalidating a forum selection clause that restricted the plaintiffs' ability to bring his Jones Act suit in any eligible forum).[10]

---

[10] *But see Terrebonne v. K-Sea Transp. Corp.*, 477 F.3d 271, 281 (5th Cir. 2007).  *Terrebonne* is more than unpersuasive, however.  The *Terrebonne* court held that the venue provisions of FELA section 6 did not apply to the Jones Act because the Jones Act had its own venue

Second, contracts mandating arbitration of a Jones Act claim, such as the Agreement at issue here, directly implicate FELA section 5 and *Boyd*. Harrington brought suit in the District Court for the Eastern District of New York. "It is not disputed that [Appellant] is liable to suit," *Boyd*, 338 U.S. at 265, in that forum under the Jones Act. The Agreement compelling arbitration, however, if enforced, would prevent Harrington from being able to pursue his claims in that forum. Accordingly, the Agreement deprives Harrington of the "substantial right" to bring suit in "any eligible forum," and effectively allows Weeks Marine to contract out of liability to be sued in the jurisdiction Harrington selected. *See id.* at 265-66; *Krenger v. Penn. R.R. Co.*, 174 F.2d 556, 559 (2d Cir. 1949) (Op. of Clark, J.). It follows that the Agreement contravenes FELA section 5 and is void.

The majority fails to recognize this point when it argues that *Boyd* protected only the right to bring claims in an eligible forum, and that the arbitral forum to which the Agreement shifts Harrington's right to adjudication is both eligible and favored. *See* Maj. Op. at **[19-20]**. *Boyd* did not merely protect a plaintiff's ability to adjudicate his claim in *some* eligible forum. The contract at issue in *Boyd* did not, after all, prevent that, because it recognized as eligible fora both the state county court and the federal district court where the plaintiff resided at the time of his injuries (or alternatively the state and federal fora in which the injuries were sustained). *See Boyd*, 338 U.S. at 263-64. Instead, *Boyd* interpreted FELA section 5 to protect the plaintiff's

---

provision. As a result, the court reasoned, FELA section 5, as interpreted by *Boyd*, did not apply to protect the plaintiff's choice of venue in a Jones Act case. Whatever the merit of the *Terrebonne*'s holding on this point—and I believe it was in error—the predicate for the court's reasoning has been totally undercut by subsequent legislation that deleted the Jones Act's separate federal venue provision. *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, Title XXXV.C, § 3521, 122 Stat. 3, 596. The amendment was made retroactive to the last codification of the Jones Act in Public Law 109-304, which occurred on October 6, 2006. In a reply brief, Appellant all but concedes that this amendment to the Jones Act completely undermines this aspect of *Terrebonne*. *See* App. 2d Rep. Br. at 4 n.2.

13

right to bring his claim in *any* forum that was made eligible to him by statute, because the Court recognized that "[t]he right *to select* the forum" that was granted by FELA section 6 was a "substantial right." *Id.* at 266 (emphasis added). It is this fundamental FELA/Jones Act right "to select" that the Agreement before us takes away from Harrington. *Cf. Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a special kind of forum-selection clause . . . .").

**B.**

I recognize that other courts have held that FELA sections 5 and 6 and *Boyd* do not preclude the enforcement of a seaman's agreement to submit Jones Act claims to arbitration. *See* Maj. Op. at **[22]** (collecting cases). But those courts, like the majority here, reach this result by unjustifiably limiting the scope of the Supreme Court's holding in *Boyd*.

The majority argues that the purpose of FELA section 6 is "to ensure the existence of a practical and convenient forum to adjudicate the employee's rights," and that an agreement to submit to an arbitral forum "without geographic constraints," does not frustrate this purpose. *See* Maj. Op. at **[19-20]**. By contrast, the majority argues, the agreement at issue in *Boyd* did impose a geographic restriction in the plaintiff's choice of venue. Certainly, convenience to the worker-litigant was one of the purposes behind § 6. *See Baltimore & O. R Co. v. Kepner*, 314 U.S. 44, 49-50 (1941). But this was not the provision's only object. If it were, it would be hard to understand the Supreme Court's decisions interpreting FELA section 6 to bar a state court from enjoining its citizens from suing railroad companies in the state courts of *another* state or in the federal district court of *another* state. *See Miles v. Illinois Cent. R. Co.*, 315 U.S. 698 (1942) (invalidating an injunction entered by a Tennessee state court against a Tennessee resident from further prosecuting her FELA claim arising from the death of her husband in a Missouri state

court); *Kepner*, 314 U.S. at 51 (holding that FELA section 6 does not permit a state court to enter an injunction against the prosecution of a FELA claim in a remote federal district court in the face of the defendant railroad's contention that the plaintiff was "acting in a vexatious and inequitable manner in maintaining the federal court suit in a distant jurisdiction when a convenient and suitable forum is at respondent's doorstep").

Congress had, in fact, more in mind than convenience. By allowing the injured workman to "choose from the entire territory served by the railroad any place in which to sue" and to choose between bringing his claim in either state or federal court, Congress also "intended to give the disadvantaged workman some leverage." *Miles*, 315 U.S. at 707-08 (Jackson, J., concurring); *see also Krenger*, 174 F.2d at 561 (opinion of Hand, C.J.) ("[FELA] bears evidence that in the eyes of Congress employees do not bargain in all respects as equals with the roads."). And Congress manifestly had the same intent to give seamen an edge, and to provide "heightened legal protections" when it passed the Jones Act. *See Chandris, Inc.*, 515 U.S. at 354. It did so, *inter alia*, by giving them these distinct procedural advantages: the unilateral right to seek a jury trial or a bench trial, and the ability to bring suit in any eligible forum. *Boyd*, I believe, recognized this, and it is wrong now to reduce its holding to a mere prohibition on contractual agreements that impede the plaintiff's ability to bring suit in a forum that is geographically convenient.

**C.**

This all leads to what is perhaps the most important issue in this case: the relationship between the Jones Act/FELA and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. The question of whether the FAA requires enforcement of agreements to arbitrate claims brought under certain federal statutes is by now a familiar, if still often-difficult, issue. *See, e.g.*, *Gilmer*

15

*v. Interstate/Johnson Lane Corp*, 500 U.S. 20, 26-27 (1991) (holding that a claim brought under the Age Discrimination in Employment Act was subject to the parties' compulsory arbitration agreement); *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 205 (2d Cir. 1999) (finding no inherent conflict between the underlying purposes of Title VII and the 1991 Civil Rights Act and the imposition of compulsory arbitration). But the Jones Act and FELA are unique federal statutes in part because of their particular historical relationship to workers' compensation laws. *See supra* at **[8]**. I believe that this connection to workers' compensation laws provides a strong reason to resist the reflexive assumption that some other courts have made that the "liberal federal policy favoring arbitration agreements," *Gilmer*, 500 U.S. at 25, necessarily trumps the particular worker-protection values that underlie these laws.

FELA and the Jones Act were passed at a time when legislative bodies throughout the nation were rethinking common-law rules that frequently operated to the great disadvantage of injured workers. *See New York Cent. R. Co.*, 244 U.S. at 159-60 (Brandeis, J., dissenting) (describing the origin of FELA and explaining how common-law doctrines of fellow servant's negligence, assumption of risk, and contributory negligence "practically abolished the liability of employers to employees" when they were applied to "huge organizations and hazardous occupations, as in railroading" resulting in "great hardship and apparent injustice"). While states began to remove some of these common-law barriers to recovery, in general—and most states took the more dramatic step of establishing liability without fault in the employment context through workers' compensation laws—Congress acted analogously in protecting the at-risk workers who fell within the scope of its (then quite limited) Commerce Clause power. *See Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 507-08 (1957) (describing FELA's elimination of the common-law defenses of contributory negligence, the fellow servant rule, and assumption of

16

the risk).[11] As Justice Douglas wrote with respect to FELA, the Act "was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations" by changing the strict rules of liability placed upon employees by the common law and providing employers with incentives to avoid or lessen hazards and risks. *See Wilkerson v. McCarthy*, 336 U.S. 53, 68 (1949) (Douglas, J., concurring).

FELA and the Jones Act did not go as far as state workers' compensation laws sought to do in both forcing employers to internalize the accident costs of their operations and providing true insurance to employees because the two acts did not eliminate fault as the basis for recovery.[12] Even so, as the Supreme Court made clear, Congress intended these statutes to "provide liberal recovery for injured workers" for the industries covered in a manner very much aligned with the spirit behind workers' compensation laws adopted at the state level for other industries. *See Kerman v. Am. Dredging Co.*, 355 U.S. 426, 431-32 (1958) (describing change in public policy favoring compensation of employees and their dependents for "the losses

---

[11] Congress passed amendments to FELA in 1939 to proscribe, in no uncertain terms, judicial invocation of the assumption of risk defense and to eliminate other "fetters" to recovery imposed by federal courts implementing the initial 1908 legislation. *See Rogers*, 352 U.S. at 508-09.

[12] This limitation was often lamented. *See, e.g.*, *Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 539 (1957) (Frankfurter, J., dissenting) (describing application of common-law doctrine of negligence to injuries suffered by railroad employees—as opposed to provision of true workers' compensation—as "archaic" and "cruel"); *Miles*, 315 U.S. at 707-08 (Jackson, J., concurring) (characterizing FELA as maintaining a "medieval system" of compensation that gives injured workers and their survivors "only a lawsuit" rather than "a remedy"); *see also* Clarence A. Miller, *The Quest for a Federal Workmen's Compensation Law for Railroad Employees*, 18 Law & Contemp. Probs. 188 (1953) (documenting (ultimately failed) efforts subsequent to FELA's enactment in 1908 to establish federal workers' compensation laws).
      Unlike railway workers, seamen do also have the ability to obtain limited no-fault recovery for maintenance and cure, a remedy recognized as implied in contracts of marine employment. *See Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730 (1943). "Maintenance includes sustenance and a berth while aboard ship and payment for the cost of board and lodging while ashore. Cure refers to proper care of the injured seaman." *Mooney v. City of New York*, 219 F.3d 123, 127 n.1 (2d Cir. 2000).

occasioned by the inevitable deaths and injuries of industrial employment," and explaining that while "[f]or most industries this change ha[d] been embodied in Workmen's Compensation Acts," FELA and the Jones Act provided the framework in the railroad and shipping industries, and gave to the courts the duty to fashion remedies for injured workers in a manner consistent with a policy of liberal recovery); *see also* Louis L. Jaffe, *Res Ipsa Loquitur Vindicated*, 1 Buff. L. Rev. 1, 15 (1951) ("The FELA serves as a glorified workmen's compensation [statute.]"). This Circuit continues to recognize the distinctive nature of FELA and the Jones Act by applying relaxed standards of negligence and causation to claims brought under those statutes. *See Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999).

Thus, in a way, the Jones Act and FELA are akin to a federal attempt to provide workers' compensation for injured employees. Accordingly, in trying to determine how the worker-protection policies embodied in those statutes interact with the FAA's "strong federal policy favoring arbitration as an alternative means of dispute resolution," *Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 121 (2d Cir. 2010) (internal quotations omitted), it is useful to look to the states' treatment of arbitration in relation to workers' compensation laws. In this regard, I find it instructive that a considerable number of states either bar or limit the scope of mandatory arbitration agreements in the context of workers' compensation statutes.[13] It is also

---

[13] *E.g.*, MONT. CODE § 27-5-114(2) (stating that pre-dispute arbitration clauses are valid and enforceable "except [for] . . . (d) claims for workers' compensation"); Neb. Rev. Stat. § 25-2602.01(e) (indicating that provisions establishing validity of written arbitration agreement "do not apply to a claim for workers' compensation"); S.C. CODE § 15-48-10(b)(2) ("[N]otwithstanding any other provision of law, employers and employees or their respective representatives may not agree that workmen's compensation claims . . . shall be subject to the provisions of this chapter and any such provision so agreed upon shall be null and void."). Other states do not specifically exempt workers' compensation claims from the scope of arbitration statutes, but instead attempt to exclude a larger class of claims that likely includes workers' compensation claims. *E.g.*, GA. CODE § 9-9-2 (excepting a variety of contracts from state's arbitration provision including agreements to arbitrate "future claims arising out of personal

18

significant that, as a practical matter, relatively few agreements to arbitrate workers' compensation disputes appear to exist. From this, one can derive the notion that the fundamental rights given to workers in workers' compensation are not as readily viewed as being subject to, or appropriate for, private resolution through arbitration.

This evaluation would not, of course, end the matter if the question we were addressing was the effect of the FAA on state workers' compensation laws. For even in states that attempt to insulate workers' compensation claims from mandatory arbitration, the FAA, being a federal law, is potentially preemptive. *See Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). But regardless of that state/federal question,[14] what is one to say about the federal/federal relationship between the Jones Act/FELA and the FAA? This is an entirely different question because it does not involve preemption. Whatever limits the FAA may be read to impose on state legislatures, Congress has the unlimited ability to privilege in federal statutes values that in some contexts it deems sufficiently important, without displacing the federal policy favoring arbitration agreements in most other circumstances. As the Supreme Court has repeatedly recognized, "all statutory claims may not be appropriate for arbitration," and while parties generally will be held to their bargain to arbitrate, courts should not enforce an agreement to

---

bodily injury or wrongful death based on tort"); IOWA CODE § 679A.1 (declaring enforceability of written arbitration agreements except as applied to, *inter alia*, "[a] contract between employers and employees"); WIS. STAT. § 788.01 (same).

To be clear, I do not intend to say anything about the ultimate validity of these statutes. My point is only that they exist, and that this suggests something about whether legislatures that establish workers' compensation systems believe those claims should be subject to mandatory arbitration.

[14] Some courts have found, without much discussion, that the FAA does preempt state laws that do not permit agreements to arbitrate workers' compensation claims. *See, e.g.*, *Miller v. Public Storage Mgmt., Inc.*, 121 F.3d 215, 218 (5th Cir. 1997). The issue rarely arises in federal courts, however, and does not appear to have been considered by this Circuit.

19

arbitrate specific statutory claims if "Congress . . . has evinced an intention to preclude a waiver of judicial remedies for the statutory right at issue." *Gilmer*, 500 U.S. at 26.

Because the underlying right for workers protected by the Jones Act and FELA have been judged non-amenable to private resolution by legislative bodies conferring analogous rights in the workers' compensation context, we should be reluctant to interpret the Jones Act and FELA to cede to the policy of the FAA. This is especially so as there are strong indications that Congress sought to insulate FELA and the Jones Act from agreements that would undercut the procedural structures of these laws, as arbitration inevitably would, just as many state legislatures have sought to do—*mutatis mutandis*—for state workers' compensation laws. *See Boyd*, 338 U.S. at 266. FELA section 5 does not expressly reference agreements to arbitrate in the scope of its prohibition in the same manner as some states laws do with respect to workers' compensation claims. This is not surprising given the modest use of arbitration at the time FELA and the Jones Act were enacted. Yet FELA section 5, much like those state laws, reflects an understanding that the procedural protections provided by laws for the compensation of injured workers are "part and parcel" of the substantive remedy provided. And that provision also demonstrates a judgment that agreements that we ordinarily allow and even favor—whether venue agreements or arbitration agreements—can be abused when applied to injured workers at a time of vulnerability. One need look no further than to the procedural background of the agreement in this case to understand the basis for such a judgment!

* * *

For all of the reasons stated above, I would affirm the judgment of the District Court and allow discovery in this case to commence in a judicial forum. I therefore respectfully, but emphatically, dissent.